Tiffany Amelia DINKINS *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 00-385                                          34 S.W.3d 366

Court of Appeals of Arkansas
Division II
Opinion delivered November 22, 2000
[Petition for rehearing denied January 17, 2001.]

*Floyd J. Taylor, Jr.*, for appellant.

*Kathy L. Hall*, for appellee.

JOSEPHINE LINKER HART, Judge. Tiffany Dinkins appeals a court order that terminates her parental rights pursuant to Ark. Code Ann. § 9-27-341 (Supp. 1999). She argues that the chancellor's finding that she failed to correct the conditions that caused the children's removal are clearly erroneous and that he erroneously concluded that she failed to provide significant material support for her children. We agree with appellant and reverse and remand.

On March 24, 1997, Dinkins was nine-months pregnant and applied for assistance from the Arkansas Department of Human Services (DHS). At this time a DHS agent, Juanita Turner, noticed a facial bruise on the right cheek and right ear of appellant's four-year-old daughter, K.D., who stated she was hit by Dinkins. On the following day, Turner conducted a two-hour at-home interview with Dinkins, who was living in a two-bedroom trailer with her eighty-year-old godmother and her three children — K.M., aged twenty-two months; K.R.D., aged three; and K.D. Turner reported

that the trailer was disheveled — two garbage cans overflowing with dirty diapers and garbage; pots, pans, and dishes with food cluttering the stove, sink, and counter areas; a strong odor of soured food emanating from the kitchen; clothes on the floor of every room; dried pieces of food and other debris embedded in the carpet of every room; empty beverage cans on the bedroom floor; and dressers overflowing with clothes. During the visit, K.M.'s feces-filled diaper was not changed and K.D. revealed numerous multi-colored bruises on her neck, face, right ear, arms, and legs along with scratch marks under her chin. Turner further observed a red welt on the palm of K.D.'s hand that she said was caused when Dinkins stuck her with a tweezer. K.D. and K.R.D. said that Dinkins slapped them in the face and hit them with a stick.

The children were taken to Mainline Health Systems by Turner for an examination on March 26. At this time, Turner noticed that K.D. and K.R.D. had bruises on the left side of their chests that were, according to them, caused by Dinkins hitting them with a belt. K.R.D. also stated that she was hit in the face by a shoe thrown at her by Dinkins.

Based on the living conditions along with the fact that Dinkins's first prenatal visit for her pregnancy was several days earlier and her only means of support was her godmother, Turner concluded that the juveniles were in substantial danger of continued maltreatment. An *ex parte* juvenile court order removed the children from Dinkins's custody, and thereafter another order found probable cause of dependency/neglect and ordered DHS to retain custody of the children. Although the juvenile court's adjudication order left the children in DHS's custody, it allowed Dinkins to visit the children in a manner prescribed by DHS. The court further found that the goal of the case was reunification commensurate with the objectives and tasks contained in DHS's case plan, and required Dinkins to attend mental health counseling and complete parenting classes. Finally, the court, pursuant to Ark. Code Ann. § 9-27-346 (Repl. 1998), declared that Dinkins did not have the ability to pay child support although she had an obligation to do so.

During the following two years, the children remained in DHS's custody, and the case was reviewed nine times.[1] Except for

---

[1] The first seven reviews were conducted by a different chancellor than the chancellor

the July 8, 1999, order following the final review, every order found that the goal of the case would be reunification. The court further found that Dinkins had substantially complied with the orders of the court and DHS's case plan in orders dated November 5, 1997; April 13, 1998; October 7, 1998; December 15, 1998; and April 27, 1999. In fact, the chancellor found that her progress was so substantial that he ordered DHS to allow unsupervised, at-home visitation following the December 15, 1998, hearing, and, thereafter, DHS consequently granted her at-home visitation with the children every weekend.[2]

This case took a markedly different tone during the final two review hearings.[3] DHS in its February 18, 1999, court report recommended that if Dinkins remained in compliance with court orders and the case plan, then it would recommend at the March 1, 1999, hearing that she be given at-home visitation with the children for thirty days. However, at the hearing, the chancellor refused to allow the children to have any unsupervised visitation after reviewing six photographs taken by a housing authority agent that showed Dinkins's home in a generally messy condition such as clothes strewn on furniture and dishes in the kitchen sink and, according to him, potentially dangerous because cleaning solutions were on a kitchen counter. The record, however, was silent as to whether the bottle-tops of these items were properly fastened. Nevertheless, the chancellor's dissatisfaction was apparently so strong that he abolished the weekend visitation that DHS had arranged pursuant to a previous court order.

Approximately three months later, DHS petitioned the court to terminate Dinkins's parental rights despite the fact that little had changed since its previous effort to obtain the court's permission to give Dinkins at-home visitation with her children for thirty days.[4]

---

whose decision is the subject of this appeal.

[2] Although DHS petitioned to terminate Dinkins's parental rights in October, 1998, it did so because it understood that it was required to do so pursuant to the federal Adoption and Safe Families Act of 1997; however, DHS later voluntarily dismissed the petition because it claimed that new federal regulations did not require it to pursue the termination of Dinkins's parental rights. At that time, the goal of the case became reunification once again.

[3] The second chancellor presided over these hearings.

[4] In fact, this petition was basically identical to the earlier petition DHS withdrew. The only apparent additions to this petition were allegations that appellant's parental rights in two other children were terminated in New York and that the fathers of the children in DHS's custody had not been a part of the children's lives since DHS acquired custody.

The last review hearing was conducted on May 11, 1999. At that hearing, the chancellor found that there was overwhelming evidence that the goal of the case should be termination of parental rights. At the hearing on the termination petition on August 5, 1999, Vickie Gibbs, a family service worker; Turner, the DHS agent; Mark Wargo, a psychological examiner from Delta Counseling Associates; Dinkins; and K.D., one of Dinkins's children, testified.

Gibbs testified that the children had remained in foster care for over two years and that from the beginning the goal had been reunification. Pursuant to the case plan, Dinkins was responsible for maintaining a clean house, completing counseling, and otherwise cooperating with DHS. She testified that Dinkins acquired an apartment from the housing authority in Crossett, and in the beginning she kept the apartment clean, but later it became inappropriate for children. She was convinced that the apartment was unsafe because of photographs of the apartment depicting a bottle of bleach on the counter along with detergent that the children could reach, a sink filled with dishes, a water-filled bucket on the floor, piles of clothes throughout the house, and a table covered with items. She specifically expressed the opinion that the mop bucket and the bleach were safety hazards, and further testified that Dinkins had been given an eviction notice as a result of these conditions along with her failure to timely pay rent.

Dinkins also had approximately four different jobs during the time the children were in DHS's care, according to Gibbs. Although she admitted that Dinkins had been financially able to feed and clothe her children, Gibbs opined that Dinkins did not have enough money to support the children in DHS's care and the two children at home.[5] She also admitted that she could not give a documented example in which Dinkins did not cooperate with DHS, and that earlier that year she recommended that the children be placed back in Dinkins's home.

Turner testified that the problems Dinkins had in getting her children back were her failure to control her anger; the continued

---

[5] We note that the record is devoid of any evidence that DHS attempted to collect child support from the children's fathers and to make the collection of such support a part of the case plan.

physical abuse, as exemplified by K.D.'s burn; and her messy house. She agreed with Gibbs that the photographs depicted safety hazards, such as an iron with its cord hanging off of the side of an ironing board, and that the photographs of the messy apartment were the sole basis for her recommendation that Dinkins's parental rights be terminated. Turner further acknowledged that although K.R.D. told her that Dinkins had caused a mark on her left arm by pinching her, she did not report it as an incident of abuse. Additionally, she testified that K.D. had a quarter-sized burn on her throat, but K.D. did not realize having it, Dinkins denied causing it, and Turner did not seek medical care for it.

Mark Wargo, a psychological examiner from Delta Counseling Associates, testified that he had been Dinkins's primary therapist for approximately two years and counseled her regarding child abuse, anger management, and parenting. He opined that her anger management had progressed slowly, but noticeably; and that during their counseling sessions, she would bring the children that lived with her and appeared to be someone who cared for her children. He noticed that she used the lessons he taught her to deal with her children, and testified that he recommended to the court in a letter that the children in DHS's care be returned to Dinkins for a trial-visit to determine if she had progressed as a result of the counseling.

Mr. Wargo testified that parenting skills were the focus of the therapy, and understood that Dinkins had not in the past corrected her children properly, but he never observed any maltreatment or abuse. Dinkins, however, admitted to him that she struck her daughter across the ear on an earlier occasion and that she had punished her children by slapping them, but she denied using her fist or burning her daughter.

Dinkins then testified that she did not want to lose her children and admitted that she once had a problem with anger, which was not an easy thing for her to admit. She admitted that she needed help and that was the reason she had been for the most part consistent with attending her counseling sessions. She testified that she never refused a visitation with her children, and that whatever visits she did miss were the result of misunderstandings.

She testified that she was told that she needed to find a place to live, and she began living in an apartment in Crosset in October,

1997, and admitted that she received several eviction notices while living in that apartment. She explained that the reason she received one of the notices was because she paid her monthly rent of one dollar on Monday when the rent was due on the previous Sunday. Moreover, she explained that the reason her rent payments had been late on several occasions was because she had to travel to the housing authority office to pay the rent. She also acknowledged that she understood that she would be evicted if she received one more notice, but stated there had been no violations since the March 10 hearing and she passed the monthly pest-control inspections.

Dinkins admitted that her apartment occasionally was messy, but stated that not all of the bedrooms in her apartment are used for sleeping — such as the room in which she keeps a lot of clothes and the iron and ironing board. Additionally, she testified that she had been ironing the day the housing authority took the pictures.

Dinkins, however, denied burning K.D., and stated that pinching was not an acceptable form of punishment. She, however, admitted that two or three years in the past she had caused a bruise on her daughter's face, but believed that her anger-management classes had helped her. She also testified that she had completed parenting classes and that she had made efforts to collect child support for the children. Finally, she testified that her children's shots were current and that she had no problem feeding her children.

Although she admitted that she had multiple jobs during the past several years, she stated that she had been fired from only one job (Georgia Pacific, because she was accused of using the phone too much), and resigned from her remaining jobs because of pay, conflicts with school, or inability to get a baby sitter for late-night work. She testified that she had recently begun work at the hospital and would work there as needed. She stated that she did not have either a telephone or vehicle, but she could get around town with rides from friends and could call for emergency assistance by using a neighbor's telephone.

Turner then testified again in rebuttal. She testified that on March 12, K.D. asked her to deliver a note to Dinkins stating that

she wanted her mother to stop pinching her. Instead of delivering the note, Turner kept it.

K.D. then testified that she did not know how she got the burn, and that her statement that her mother caused the burn was untrue.

The chancellor on August 5, 1999, granted the petition terminating Dinkins's parental rights and found, *inter alia,* that by clear and convincing evidence it was contrary to the children's best interest that they be returned to her custody; that the children had resided outside her home for more than two years; that despite DHS's meaningful rehabilitation efforts, she had failed to correct the conditions that caused the children's removal; and that for more than twelve months she had failed to materially support her children. From that order comes this appeal.

■ Cases such as this are reviewed *de novo* on appeal, *Wade v. Arkansas Dep't of Human Servs.*, 337 Ark. 353, 356, 990 S.W.2d 509, 511 (1999), but the scope of that review is limited, as our supreme court recently explained in *Ullom v. Arkansas Dep't of Human Servs.*, 340 Ark. 615, 621, 12 S.W.3d 204, 208 (2000):

> The facts warranting termination of parental rights must be proven by clear and convincing evidence. In reviewing the trial court's evaluation of the evidence, we will not reverse unless the court's finding of clear and convincing evidence is clearly erroneous. *Baker v. Arkansas Dep't. of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). Clear and convincing evidence is that degree of proof which will produce in the factfinder a firm conviction regarding the allegation sought to be established.

*See also M.T. v. Arkansas Dept. of Human Servs.*, 58 Ark. App. 302, 305, 952 S.W.2d 177, 178 (1997); Ark. R. Civ. P. 52 (findings affirmed unless clearly erroneous). Lastly, "[a] finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Wade,* 337 Ark. at 356, 990 S.W.2d at 511.

*I. Findings Clearly Erroneous Because Not Based
on Clear and Convincing Evidence*

The controverted grounds on which the chancellor ordered the termination of parental rights are found in Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a), which provides that after finding by clear and convincing evidence that it is in a juvenile's best interest, a juvenile court can terminate a parent's parental rights if the following is also proved by clear and convincing evidence:

> That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months, and, despite a meaningful effort by the Department of Human Services to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent.

Although Dinkins concedes that the children have been adjudicated dependent-neglected and that they have resided outside her home for more than twelve months, she argues that the chancellor's finding that she failed to correct the conditions that caused the children's removal is clearly erroneous because it is not based on clear and convincing evidence. We agree.

The conditions that caused the children's removal were the multiple injuries to the children caused by Dinkins, the cramped and unsanitary conditions of the trailer in which she was living, and her lack of self-sufficiency. DHS's witnesses, however, testified at the termination hearing that since the children were removed, Dinkins has maintained her four-bedroom apartment for over a year-and-a-half, that there were several occasions in which the apartment was sufficiently tidy, that she has been able to otherwise provide for her other children's needs on her own, and the only times there has been an issue of potential abuse was the unreported pinch-mark and the mysterious burn-mark.

We are guided by the principle that "when the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship." *Ullom*, 340 Ark. at 621, 12 S.W.3d at 208 (citing *J. T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997)). Moreover, "[w]hile the rights of the natural parents are not to be passed over lightly, they must give way to the best interests of the children

when *clear and convincing evidence* shows the natural parents are incapable of providing for the reasonable care for their children." *Moore v. Arkansas Dep't of Human Servs.*, 69 Ark. App. 1, 6, 9 S.W.3d 531, 535 (2000) (emphasis added).

■ Upon reviewing the entire evidence, we are left with a definite and firm conviction that DHS has not demonstrated by clear and convincing evidence that Dinkins failed to correct the conditions that caused the children's removal. The abstract plainly demonstrates that Dinkins acquired and maintained an apartment that is substantially more spacious than the trailer in which she and the children lived at the time DHS took custody of the children, and that with private employment and some public assistance she has been able to provide the necessities for both herself and the two younger children who resided with her. Furthermore, although Dinkins's apartment is messy from time-to-time, and there is arguably the occasional presence of a latent risk, there is a lack of *clear and convincing evidence* that intolerably unsanitary conditions that pose patent health risks such as exposure to pails filed with diapers soiled with human waste, odor of soured food, etc. — existed in her apartment where she resided for one and one-half years.[6] Finally, not only is it unclear whether Dinkins caused either the single instance of a pinch mark or the single instance of a quarter-sized burn mark on which DHS based its claim of continued abuse, both of these instance are certainly unlike the injuries that led to the children being placed in DHS's custody, which resulted in DHS seeking medical care for the children.[7] We, therefore, reverse and

---

[6] In *Donna S. v. Arkansas Dep't of Human Servs.*, 61 Ark. App. 235, 966 S.W.2d 919 (1998), we affirmed the termination of parental rights because, in part, the parent failed to keep the living conditions clean, but the constant maintenance of clean living conditions was critical in that case because the child suffered from sickle-cell anemia, which rendered him constantly at risk for contracting life-threatening infections, and an eating disorder, which required that he be fed with an apparatus that had to be kept clean.

[7] Orders terminating parental rights have been affirmed on appeal when there has been a finding of significant abuse by a parent after a child has been placed in DHS's custody. See *Ullom*, 340 Ark. 622, 12 S.W.3d 209 (twenty-one-day-old child's initial abuse was a spiral fracture to her arm, and her subsequent abuse by a parent after DHS acquired custody resulted in bruising to both sides of her face and occurred on the very next occasion in which the parents were alone with her); *M. T.*, 58 Ark. App. at 305, 952 S.W.2d at 178-179 (seven-week-old child's initial abuse was a skull fracture caused by parent's boyfriend, and his subsequent abuse was his mother's failure to treat infected blisters on his feet and occurred after his mother had regained custody of him from DHS).

Orders terminating parental rights have also been affirmed on appeal when there was no

remand.

## II. Appellant Did Not Fail to Provide Significant Material Support

Dinkins's final point on appeal is that the chancellor erroneously concluded that she failed to provide significant material support. In its response appeal brief, DHS stated:

> Appellant is correct when she asserts that . . . [DHS] did not request contributions from her and that there was no order to pay child support issued by the court. . . . However, this is not fatal to the trial court's decision to terminate Appellant's parental rights. The trial court had reason to terminate Appellant's parental rights pursuant to the reasons addressed in POINT I on appeal. When a court reaches the right decision, albeit for the wrong reason, it should be affirmed. . . .

■ Plainly, DHS relied on our affirming this case on the first issue, but for the reasons stated above we have reversed and remanded on that issue. Furthermore, DHS is correct that Dinkins has not violated an order to provide child support because no such order existed. Accordingly, we also reverse and remand on this issue.

Reversed and remanded.

JENNINGS and MEADS, JJ., agree.

---

attempt to reunify the parent with the child following a finding of significant physical abuse. *See Moore v. Arkansas Dep't of Human Servs.*, 333 Ark. 288, 289-290, 969 S.W.2d 186, 187 (1998) (father criminally convicted and his parental rights terminated after his five months old son stopped breathing and an emergency room examination revealed that both of the his son's legs were broken, and his son had a linear skull fracture, bilateral rib fractures, and a healed fracture of the upper arm); *Gregg v. Arkansas Dep't of Human Servs.*, 58 Ark. App. 337, 952 S.W.2d 183 (1997) (parents' parental rights terminated after hospital examination revealed their child had multiple fractures of the collarbones, legs, forearms, and ribs).