Carla BROWNING and David Browning *v.* ARKANSAS
DEPARTMENT OF HUMAN SERVICES

CA 03–887                                    157 S.W.3d 540

Court of Appeals of Arkansas
Divisions I & II
Opinion delivered April 7, 2004

*Killough Law Firm*, by: *Larry Killough, Jr.*, for appellants.

*Gray Allen Turner*, for appellee.

TERRY CRABTREE, Judge. The White County Circuit Court terminated the parental rights of the appellant, Carla Browning, from three minor male children. The trial court also terminated the parental rights of Carla's husband, appellant David Browning, from two of those children, who were his biological sons. On appeal, appellants contend that the trial court clearly erred in finding that they could not provide a safe and appropriate place to raise the children and in terminating their parental rights. Specifically, appellants claim that the trial court's decision was unjustly motivated by appellants' poverty and dirty house. We disagree and affirm.

### Factual Overview

Carla Browning is the biological mother of the three children at issue in this termination-of-parental-rights appeal: J.C., born September 7, 1990; D.B., born November 4, 2000; and A.B., born June 14, 2002. David Browning is the biological father of D.B. and A.B. J.C.'s biological father was given notice of these proceedings by publication, and he did not appeal the trial court's order. Carla's next to the oldest child, R.M., is in the custody of her biological father, Tommy McMasters, and was not a subject of this case.

DHS became involved with the Browning family when Carla requested supportive services during a FINS case on November 6, 2001. At that time, A.B. was not yet born, and J.C. was an inpatient in a rehabilitative treatment center. On November 16, 2001, D.B. was placed in foster care after a seventy-two hour-emergency hold. On November 27, 2001, the trial court held a review hearing. On January 3, 2002, appellants stipulated, and the court found, that J.C. and D.B. were dependent-neglected. That

same day, J.C. was placed in foster care. Review hearings were held on January 24, 2002; March 28, 2002; July 25, 2002; and September 19, 2002. A.B. was born on June 14, 2002. He was adjudicated dependent-neglected on September 19, 2002, but he was not removed from the home until October 15, 2002. The trial court held review hearings on October 22, 2002, and November 7, 2002. DHS filed a petition for termination of parental rights on November 25, 2002. The trial court held a hearing to decide the petition on January 30, 2003.

Ultimately on February 18, 2003, the trial court issued an order finding that appellants had failed to correct the conditions which caused removal of the children and that there was little likelihood that services to appellants would result in successful reunification. The court found that, after fourteen months since D.B. was first placed in DHS custody, appellants' home was still deplorable and unfit for children despite the fact that the DHS had provided numerous services and contacts with the family. In regard to D.B. and J.C., the trial court based its decision on Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(a) (Repl. 2002) because both children were adjudicated dependent-neglected and had remained out of the custody of their parents for at least twelve months. In regard to A.B., the trial court based its decision on Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(4) (Repl. 2002) because A.B.'s parents "had his parental rights involuntarily terminated as to a sibling of the child," in this case, D.B. The trial court also terminated the parental rights of J.C.'s biological father.

### Standard of Review

When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *Bearden v. Arkansas Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 208 (2000). Termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Crawford v. Arkansas Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997). Parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *J.T. v. Arkansas Dep't Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997).

Pursuant to Ark. Code Ann. § 9-27-341(b)(3) (Repl. 2002), the facts warranting termination of parental rights must be

proven by clear and convincing evidence. In reviewing the trial court's evaluation of the evidence, we will not reverse unless the trial court clearly erred in finding that the relevant facts were established by clear and convincing evidence. *Baker v. Arkansas Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). To conclude that a trial judge made a clearly erroneous decision, we must be left with a definite and firm conviction that a mistake has been made. *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

■ In resolving the clearly erroneous question, we must give due regard to the opportunity of the trial court to judge the credibility of witnesses. *Johnson v. Arkansas Dep't of Human Servs.*, 78 Ark. App. 68, 82 S.W.3d 178 (2002). Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. *Ullom v. Arkansas Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000). Where there are inconsistences in the testimony presented at a termination hearing, the resolution of those inconsistencies is best left to the trial judge, who heard and observed these witnesses first-hand. *Dinkins, supra.*

■ A proceeding to terminate parental rights is a two-step process, requiring the trial court to find (1) that the parent is unfit and (2) that termination of the parent's rights is in the best interest of the child. *J. T., supra.* Although the trial court did not actually use the word "unfit" in its ruling, the court clearly made a finding that appellants were unable to provide the type of safe, healthy environment children require. Such a determination by the trial court is a sufficient finding of appellants' unfitness. *See id.*

*Trial Judge's Findings*

At the hearing to terminate parental rights, the trial judge made the following findings:

> The primary thrust of this case has been, and at every hearing it was made clear to [appellants], that the intolerably dirty condition of the home in which these children would potentially reside in was first and foremost before the Court. Yes, there were always issues with regard to income. There were issues with regard to parenting classes and counseling. . . . But at each and every hearing, the filth of your home, [appellants], was principally before the Court.

. . .

Also, at every hearing since we've had that I can recall, as you have today, you transfer blame and fault to an extent that I've never seen a human do. You cannot accept responsibility. . . . This case is not about you being poor. There are people with little money and little means who provide appropriate, clean, sanitary homes for their children, and there are thousands of them all across, probably White County, if not the state. It's not about you being poor. It's not even really about a dirty house. Nobody is going to terminate your parental rights because you had a dirty house one day. What this case is about is your persistent refusal to take steps to remedy the problems with your home, irrespective of the substantial efforts on the part of the Department, CASA, and a lot of other people in this courtroom[.]

. . .

[F]or fourteen months, [you] were told at every hearing that this issue of cleanliness and sanitary conditions [was] crucial to the ability of you to regain your children.

. . .

Aside from the monetary problems you have, aside from the fact that your attitude toward the Department has been less than cooperative, all of those things aside, the basic issue is you won't keep a safe home because you won't clean it up.

. . .

[T]he thought that continuing your participation in the lives of A.B. and D.B. could or would result in the behavior problems to the extent that J.C. has is something that is very scary to this Court. All three of these children deserve a safe home that they can crawl around on and play in the floor and sleep on a bed without worrying about the dangers that are apparent in your home, both inanimate and now I find live with rats.

*Nine Review Hearings*

The White County Circuit Court held nine review hearings between November 27, 2001, and January 30, 2003. We have reviewed and thoughtfully considered the testimony from each of

the witnesses at all of the hearings. The following is a summary, in chronological order, of that testimony.

### November 27, 2001, Review Hearing

At the time of the November 27, 2001, hearing, Carla testified that she and David had lived with David's family until they were thrown out. Carla stated that she has visitation with R.M. every other weekend but that she was "going to tell [the custodial father] to hold her because [Carla had] nowhere to keep [R.M.] when [Carla does] get her for the weekends."

### January 3, 2002, Review Hearing

On January 3, 2002, the trial court held a hearing, and Carla and David testified. At that time, the couple had acquired a home to rent. Carla explained that J.C.'s biological father, Delbert Daniel Hayden, paid child support every two weeks. His last known address was in Pueblo, Colorado. At this hearing, J.C., who had been in a rehabilitative treatment center, requested to return to his mother.

### January 24, 2002, Review Hearing

At the January 24, 2002, hearing Carla testified that she was pregnant and that her baby was due to arrive around June 23, 2002. She stated that she worked at McDonald's and got paid every two weeks. David stated that he expected to be hired as a field laborer at a farm in the next two weeks. The couple had no running water in their home, but David speculated that he could borrow $100 to have it turned on in about a week.

### March 28, 2002, Review Hearing

At the March 28, 2002, hearing David testified that he was still unemployed although he had part-time work at one point. Carla commented on David's inability to find a job by saying, "[H]onestly, I don't know how much job hunting he does when he leaves [home]. I'm going to be honest and say he doesn't do very much, but he does job hunt, but he doesn't do enough to satisfy me and the courts."

### July 25, 2002, Review Hearing

On July 25, 2002, Carla testified at the hearing that the infant, A.B., has "some health problems. He's on a heart monitor right now." She stated that when her maternity leave expired she

would return to work at McDonald's. At the time of the hearing, David had been employed at Dixie Café in Searcy for one week on a "trial basis." Carla admitted that they were still behind in their rent. She claimed that they had their utilities turned on in the home.

### September 19, 2002, Review Hearing

On September 19, 2002, the trial court held another hearing, and Carla stated that a daycare worker had to take her infant's car seat apart and wash it because it was dirty with oil and grease. Carla explained that the child's dirty clothes and fingernails may have resulted from his greasy car seat. Carla also explained that she was seeking new employment at a nursing home in Beebe and would be in training for that position.

J.C. testified, "I'm not trying to say this to make my mom feel bad, but I love my mom but I don't want to go home with her, because I don't want to live like they are living now." J.C. stated that he did "not have a reason for his [behavior problems] at school. I am on medication. I am taking it."

### October 22, 2002, Review Hearing

At the October 22, 2002, hearing Jody Hall, a child-maltreatment assessor with DHS, testified that she received a report of neglect regarding A.B. on October 9, 2002. As a result, she visited the appellants' home and discovered that the family had virtually no heat. Hall found one space heater in one of the bedrooms. Hall also stated that the home needed to be cleaned. She testified, "There's just junk and there's trash on the floors. . . . It's a dirty kitchen, dirty living room. . . [I] am concerned with the dirt and trash on the floor, and [A.B.] is going to be able to start rolling over soon and then we are into the crawling mode, and there were just hazards for him in the floor." Hall visited with David and told him that he needed to correct these things. Four days later, Hall returned to the home and talked to Carla. Hall advised her that DHS decided to place A.B. in care because the couple did not have the heat turned on in the home. According to Hall, she told Carla that the house was still not clean and contained hazards to the infant. Hall advised Carla of DHS's concern for A.B.'s "health because he was congested and there was not heat in the home and the temperatures were dropping." Carla responded that she hoped to get another heater by the end of the week. Hall also discovered the infant's bed under a window and feared that its

placement increased the child's chance of remaining cold. Hall stated, "I know that [the infant] was sick because I observed it. He had dry, crusty [mucous] on his nose from where he was congested and had a runny nose and was obviously sick. . . . I was concern[ed] that he was already sick and there was no adequate heat to keep him warm." Hall stated that Carla and David had been delinquent on the gas bill since June and that it would cost $132 to have the gas turned on again. Hall testified that she did not feel that the home was safe for the child.

During Hall's testimony, counsel asked her to discuss an affidavit prepared by Heather Irwin, a previous case worker for the Browning family. The affidavit noted that Carla and David were behind in their rent for two or three months. The affidavit also mentioned Irwin's warnings to the couple about leaving A.B. with inappropriate "babysitters." According to the affidavit, DHS verbally advised Carla to stop leaving A.B. with a neighbor who had three teenage children. The neighbors were deemed inappropriate babysitters because they could not respond to A.B.'s heart monitor and because the police had been called to that home several times for domestic disputes. Nonetheless, appellants continued to leave A.B. with neighbors.

Irwin's affidavit noted that David failed to complete his parenting classes. According to the affidavit, David would sleep through the classes he attended. The affidavit stated that the home was "unsanitary" and that on two occasions DHS had come to the Browning's home and cleaned it.

Next, Charles Arnold, a family service worker from White County, testified that he became a caseworker for D.B., J.C., and A.B. in late September 2002. He stated that a case plan had been prepared for the family and that it had been explained to them. The case plan included parenting classes, budgeting classes, and home cleanliness. He stated that he visited the Browning's home numerous times and even on a "good day" in the home, the "general conditions of the house [had] not improved at all." Arnold took photographs of the home's condition on the day DHS removed A.B. from the home. He said that the conditions in the home looked even worse than the photographs reflected. He described piles and "baskets full of sopping wet clothes." Arnold saw a "white-handled sharp steak knife" on the floor with rags and dirt. According to Arnold, he had taken photographs of the home at an earlier time. He stated that if he compared the two sets of

photographs, he could see no improvement. Arnold remarked that he had "not seen the home on [any] occasion when it [was] fairly clean."

Arnold testified that during a visit to the appellants' home, he found only light sheets in [A.B.'s] bed but no blankets. He noted that "bills need to be paid for any type of permanency in the home, because [Carla] told me that they were three months behind on their rent." Carla told Arnold that in three months they had only paid twenty-five dollars towards their rent. Arnold was confident that Carla understood how DHS sought to assist her family in improving its situation.

On cross examination, Arnold testified that he had visited the appellants' house the week before and the day before the hearing and that they did not have the gas turned on. He stated that Carla told him that she used different things to keep the baby warm, including a headrest from a car seat. According to Arnold, DHS informed Carla that a headrest would not be appropriate because the baby could get his face stuck in it by rolling over. However, Arnold observed Carla deliver the baby to daycare with a blanket. Arnold testified regarding concerns of caseworker, Emily Myers, who worked with the appellants' family prior to Arnold. According to Arnold, Myers reported problems at the daycare regarding A.B. being delivered without proper bathing and clothes. There were also concerns about the baby's heart monitor that still remained at issue.

Carla testified on direct examination that the gas was turned on the day before the hearing. She recalled that on the day DHS took A.B. into custody that the gas was not on. She stated that in "the bedroom where we had the small heater[,] we had the sheets over the door to keep the air in that room, it was warm in his room, in our room. But yes, it was cool in the rest of the house because the sheets were down in that part of the house." She testified that when she takes A.B. to daycare "he is clean. He is fed. He does have a clean diaper. Some of the time I have to stop and feed him on the way there." Carla explained that she does laundry in her home but that DHS "did catch me on a day when I was doing laundry." She claimed that she cleaned her house. Carla stated that she had taken A.B. for medical care several times but that he "constantly has a running nose."

According to Carla, she had completed training to be a nurse's assistant. She stated that she would be hired by a retirement center in Beebe. She said that A.B. has a heart monitor because he

has a sleeping disorder. She testified that A.B. could stop breathing in his sleep and that she is required to keep the monitor on him at all times.

Carla testified that the last time she worked was one day "last week or the week before." On that occasion, she only worked four hours at McDonalds. She said that McDonalds had failed to return her to her weekly schedule after her maternity leave.

Upon examination by the court, Carla admitted that the couple had three dogs and that she regularly bought food for them. On re-cross examination, she stated that her husband was working for a construction company in Little Rock where his brother served as the foreman. She said that he makes $8.50 per hour and that he is scheduled to work forty hours per week. She also said that he does not get paid if it rains and he does not work. Carla admitted that she had not taken her state licensing test to be a CNA.

Johnna Collins testified that she works for DHS and provides services to families. She stated that she helped clean the Browning's home on two occasions. She stated that the appellants' landlord decided to evict the family because "the house was, as he put it, filthy." At that time, DHS was trying to help the family maintain the home. Collins recalled visiting the appellants' home the first time and described the interior as filled "approximately up to my chin, and I'm almost six [feet tall], just covered in boxes of just broken junk. I mean, for the lack of a better term, just junk." Collins testified:

> We asked the family what they needed us to help with. At the time, [Carla] was pregnant, . . . we set up a meeting with the landlord, who came out and met with us. He was very frustrated with the family. The landlord was in agreement to let them stay there rent free until the end of January if we would go out and assist them with cleaning the home and the Department agreed to paint and do some repair work in the home to make sure they would have a home until they both became employed. At the time, they were not employed at all. Myself and [my supervisor] at the time, went to the home early, I believe on a Wednesday morning . . . in December. We cleaned the entire home with [Carla's] permission. . . . [Carla] and David did not do anything, but they did walk through and tell us what we could do. . . . [A]s a matter of fact, [they] were entertaining a dinner guest at the kitchen table while we were clearing out boxes and even made a joke about maybe we could go help the other

family after we finished theirs. We cleaned it completely. It took us three days, and it took us contacting several city officials in Beebe to figure out where to dump the items, there were so many. . . . It took about eight loads [to a city dumpster], just to give you an idea of how much stuff there was. We finally got that done. We were very excited. We had a cleaning crew from Harding that we had gotten together that was going to come out and help us paint and make it pretty and make sure that they . . . had their rent covered.

When we went out to assess the situation Monday, the house looked like we had never been there. We were pretty surprised. I remember [my supervisor] and I were there together. We asked what had happened. All these boxes we had moved out, and all of the sudden there was — as if we had never been there, just piles and piles of boxes. It was different stuff. And we found out that what they had done is, they had more stuff than what was actually in the house but they had put on the back of a trailer and covered in a tarp. So the second we got everything cleaned and gutted out the first time, they just went back in and unloaded all the other stuff. . . . We had scheduled the painting party, we had to go out and redo it again. And we did it [a] second time. Then, Harding came in and helped us get everything painted and the landlord agreed that they would owe rent beginning in February. So, we've done that twice at this point. The last time I saw the house was about a month ago. But I did continue working with the family from that point until about a month ago. It did deteriorate within a two-day period. We went out the second time we cleaned it, we went back out a couple of days later, and it was just clutter, open cans, open food containers just laying everywhere in the kitchen, dishes not being done at all, bathroom was just covered in dirty laundry. [Carla's] reasoning was that they had no water, so they had no way to clean. So; I assisted them with putting them in touch with CAPCA, who then made a payment on all of their utilities, because currently they had no utilities. They had lost everything. And so CAPCA paid electric, gas, and water, huge large amounts on each, leaving just a small amount on each for the family to pay. And to my knowledge, the last time I contacted the utility companies was about a month and a half ago, and they still weren't current on any of those.

Collins testified in regard to the babysitter issue. She stated that first she and her supervisor met with the neighbor, an eighteen year old, who was "being put in charge of the child." Then Collins and her supervisor met with Carla and David and informed them about the specific concerns with the neighbor babysitting A.B.

They explained that the police had been called to the neighbor's home on several occasions for domestic disturbances and that the eighteen year old's remedy for solving the child's fever was to "hold the child in front of an air conditioner." Collins told the couple that the child would be at risk in the neighbor's home, and the Brownings agreed to remedy that problem. Collins stated that any time she spoke with [the Brownings], Collins documented the conversation. She testified that this conversation would have been documented in the "[computer] system at the office."

### November 7, 2002, Review Hearing

The next hearing occurred on November 7, 2002. Brenda Crownover, a social worker and treatment therapist with Treatment Homes, Inc., testified regarding J.C.'s therapeutic foster care. She testified that she works with J.C. and his "treatment" or foster parents. She stated that, although J.C. had behavioral issues, he wanted to see his family. She also stated that J.C.'s behavior had deteriorated and that he had even been aggressive towards his foster mother. Crownover said that J.C. "was here in court last time. He heard all of the testimony that was given, and he has a lot of information from [Carla] that she talks with him about all these issues before the court." Later, Crownover remarked that the things Carla tells J.C. "are not actually the things that are going on in the case." Crownover believed that Carla is "setting up some false hopes in [J.C.]" Crownover feared that J.C. could regress to the point that he would need to be hospitalized on an inpatient basis again. Crownover recommended, that during visitation with J.C., Carla should shift her focus to J.C.'s needs. Crownover stated, that after visitation, J.C.'s overall behavior deteriorates. However, Carla testified that she would like to see her children more.

### January 30, 2003, Termination-of-Parental-Rights Hearing

On January 30, 2003, the trial court held a hearing, and Heather Irwin, a placement team specialist with DHS, testified that she worked as a case worker for D.B., J.C., and A.B. from November 26, 2001, through September 3, 2002. When Irwin became the case worker, D.B. was already in foster care. Irwin stated that D.B. was brought into foster care on November 16, 2001, for inadequate housing and neglect. She stated that, at that time, J.C. was in a residential treatment center in Little Rock. Upon J.C.'s discharge from the treatment center, he was not able

to go to the appellants' home, so he entered foster care on January 3, 2002. Both D.B. and J.C. were adjudicated dependent-neglected on that day.

Irwin testified that she worked to provide services to appellants' family to correct the problems that caused the children's removal, including services such as food stamps, medicaid, budgeting, marriage counseling, individual counseling, and house cleaning. Irwin stated that Carla kept things in her home "that weren't necessary, such as old washing machines, multiple refrigerators, appliances." Irwin recalled assisting Collins in the extensive cleaning of appellants' house. Since that time, Irwin observed appellants' house filled with "large bags of clothing, just sometimes the whole hallway would be blocked off. Sometimes there would just be large amounts of laundry in the bathtub. We are talking — the beds would be covered with miscellaneous items. I mean, I don't even know how to explain it, but I mean everything you could think of would just be laying there."

Irwin stated that at the time she prepared a case plan for the Browning family, Carla was pregnant with A.B. The case plan included keeping the house clean, keeping the utilities turned on, and looking for employment. Irwin testified that Carla and David attended only one marriage counseling session; that Carla completed parenting classes; that David did not complete parenting classes; and that they were unable to maintain a clean home on a regular basis. Irwin stated that, in her opinion, "the services that I was providing to the Brownings, it was doing no good." In fact, Irwin said that she could not even recommend weekend visitation. She stated that appellants' parental rights should be terminated because "they have been unable to maintain stable employment, which means stable income coming into the home to support themselves along with three children. They also don't have a home that is suitable for children to be able to live in. . . . [T]he bedrooms that the children would be staying in would have, like I described, the clutter, the junk, the extra material in the bedrooms that sometimes I couldn't even walk into." Irwin stated that Carla was not cooperative with DHS's efforts to help her budget finances.

Irwin signed an affidavit on November 19, 2001, when appellants and D.B. were living in a van. Irwin recalled that "D.B. had lost his medication because the parents had no refrigeration for the medicine." After Carla and David rented their house, Irwin visited and described it as "unsafe for small children to live in during the time I had the case, at least at times. . . hallways would

be blocked . . . dirty dishes, old food laying around at times. . . no room for the baby — for D.B. to crawl around or anything like that.''

Irwin stated that she would tell Carla and David specifically what needed to be done with the home in order for her to allow weekend visitation. She said, "They would appear to understand what I was telling them, they would say that that would be done when they had time or when they felt like they weren't tired and able to do that. And when I would go back and it hadn't been done, I would ask them why they didn't do it. What they would say is, excuses of work and being tired." Irwin recalled that the home was never clean enough for any significant length of time to justify visitation. Irwin believed that neither Carla or David "were trying." She said that at times, it looked as if appellants had "loaded up flat bed trailers full of junk and moved it into their house." For the majority of the time that Irwin worked on appellants' case, the children were in foster care.

Also at this hearing, Johnna Collins, a social service aid, testified that she was assigned to the family's case when it first opened on November 6, 2001, and that she worked with them through September 6, 2002. Initially, Collins became involved with the family when Carla requested DHS's supportive services during a FINS hearing. However, after requesting help, Carla evaded the caseworker for several days and then informed the case worker that she wanted no visits from DHS. Collins made her first contact with the family on November 15, 2001. Collins recalled that, at that time, Carla and David lived in their van with D.B., and that DHS had a difficult time locating them. Collins recalled seeing the couple in their van on a bitterly cold night, and D.B. was wearing "a filthy t-shirt and a dirty diaper. . . . He had a fever. He had a runny nose." The following day, D.B. was removed from their custody, and the child had "head lice the size of ants that were crawling out of his head that we literally pulled out and killed in the floor at [DHS]." Collins stated that David said that they had taken D.B. to the doctor, but that the child had not received any of his medicine because it required refrigeration, and they did not have any. David told Collins that, as a result, they threw the medicine away.

Sam Boyce initially served as the case worker, and he asked Collins to provide parenting services, housing assistance, food stamps, medicaid, and other services to the Brownings. Collins testified that she provided all of those services. However, the

appellants remained homeless until the end of December 2001. According to Collins, she gave appellants homeless-shelter contact information, but they did not want to pursue homeless-shelter assistance because they preferred to stay in their vehicle. When D.B. was removed from their custody, the van was repossessed. Collins stated that appellants then began living in their truck.

Collins further testified that appellants located a house to rent, and the landlord agreed to let them stay there for free until they found employment. In the meantime, Collins gave the appellants job listings, assisted appellants in re-establishing food stamps, and sought medicaid for prenatal care for Carla's unborn child. Three weeks after the appellants moved into the rent house, Collins met with the landlord because he was ready to evict appellants as they had packed the yard and house with junk. The landlord also told Collins he was upset because the appellants had made no payment to him. As Collins provided job listings to appellants, they would respond by saying that nobody was hiring. David complained to Collins that he was looking for farm work and "didn't want to just go anywhere else." Collins said that she wanted to find employment for them to start a financial income. She tried to explain the importance of not being evicted for non-payment of rent. Eventually, the landlord gave the appellants ten days to remove the junk in the house and yard and clean the premises or else be evicted. After Collins, Irwin, and their supervisor met with the landlord, "they drew up a list of things" for appellants to do in order to stay in the house. They explained to the appellants that the landlord had limited them to ten days to remedy the situation. Collins returned to appellants' home two days later and discovered no progress had been made in spite of the fact that neither Carla or David were employed. In fact, Collins stated that there was more junk on the premises than prior to the meeting with the landlord. Collins further stated that they were trying to get the Brownings to do the necessary cleaning but that it was apparent that they weren't going to do it. As a result, Collins and her supervisor spent a full day cleaning the back bedrooms in appellants' home. Meanwhile, Carla and David "entertained a dinner guest." Collins recalled, "They were eating while we were back there cleaning. We had to ask them to move their chairs so we could move the boxes through the kitchen." Collins described the cleaning that she and her supervisor did as "gutt[ing] everything out" and that they had to call several city workers to have them haul things away.

Collins said that only days after they completed their cleaning, appellants emptied a trailer full of junk from their backyard and refilled the bedrooms and hallway. Collins stated that the landlord contacted her by phone and was very angry because the Brownings had undone everything that DHS had accomplished. Consequently, Collins agreed to a second cleaning at the home to satisfy the landlord. Even after the second cleaning, Collins visited appellants' home and discovered "open food containers, food laying [sic] around, dirty dishes. . . . stacked to where they were just going to be falling off. The bedroom, the bathroom, and we did discuss hygiene a lot, and that's why I'm bringing up the bathroom. It was just full of wet clothes that were in the bathtub and all around the bathtub and all around the commode." Collins described the back two bedrooms where David built a partition with paneling to allow him to put additional "junk" in the back "that was stacked over our heads." Collins said that the majority of the progress that was made in cleaning appellants' house was done by DHS.

In regard to parenting classes, Collins said that she offered and taught parenting classes to appellants in their home for their convenience. Carla completed her classes, but David did not because he slept through them. Collins stated that she "didn't think it was appropriate at all for me to continue talking to myself while he slept." During visitation with the children, Collins observed that appellants completely ignored J.C. and only interacted with D.B. During visitation, appellants would beg the McDonald's manager for food for themselves, not for the children. Also during visitation, Carla would make statements to J.C. that DHS could not be trusted, that DHS was a bunch of liars, and she probably would never see him again. According to J.C.'s foster mother, J.C. had behavior problems following those visits.

Collins stated that the White County DHS workers had visited or made attempts to visit the Browning family 221 times since November 6, 2001. She further stated that several other counties had provided transportation assistance to the family on multiple occasions. Collins opined, "I don't know of anything else that the Department needs to do in addition to what it's already done. I don't know what else we can do." Collins said that her last contact with the family was on August 28, 2002.

Collins stated that when A.B. was born, the family home did not have working utilities. Appellants had made arrangements to stay with a man, Mr. Holly, whom they had stayed with sporadi-

cally during their homelessness. Holly informed Collins that the couple could stay until their utilities were turned on again. Collins recalled that ultimately home health nurses reported problems with appellants' rental home and A.B.'s nutrition, which worsened until A.B. was removed from the home.

Next at the hearing, Bill Stoecker, a social service aid for DHS, testified that he was assigned to the Browning's case on September 6, 2002. He described the interior of appellants' house as "filled with clutter." He saw "clothes piled up in the bathroom. You couldn't even see the tub, the bottom of the tub, all the way up above the rim of the tub was just filled with clothes, clothes scattered throughout the bathroom and back bedrooms." Stoecker described the back bedrooms as "filled with boxes of miscellaneous items, anything from old frying pans, coffee pots, just basically anything you could find was in those rooms." He recalled that the kitchen "was overfilled with dishes piled as high as the sink could hold them, dishes scattered throughout the entire counter top. The kitchen table was unseen [and covered] with trash [and] food that had been left on the table that was being consumed by flies. There was trash overflowing out of the trash can itself, crushed soda cans laying on the floor, bottles on the floor, cigarette butts, cigarette wrapper things on the floor from whatever, candy wrappers on the floor, half-eaten food lying on the floor."

Stoecker described the living room as having "literally hundreds of metal coat hangers lying around, clothes piled on every piece of furniture they had. David would leave his tool belt lying around and nails would spill out onto the floor." Stoecker told the couple, "you need to either find a suitable place for [the clutter] where [it] is not in the way of everyday living, or you need to get rid of [it]. The trash needs to be taken out, needs to be picked up off the floor. The floors need to be swept, cleaned. The coat hangers need to be taken off the floor for the child." Stoecker explained to the Brownings that "if the child was present and the child was crawling around, he could injure himself. The same thing with like the nails, the crushed Coke cans on the floor. If you have a child in the home that's crawling, walking, could step on, pick up, choke, whatever. Just dangerous items for the child." Stoecker testified that appellants agreed to all that and understood what needed to be taken care of before the children could return to the house.

Stoecker stated that he returned to the home a week later and found that appellants had "a few of the items taken care of"

including moving the hangers from the floor to the sofa. However, Stoecker stated that there was "no major improvement. The home was never to the point that I could recommend that the children be returned to the home." Stoecker said that his visit to the house was on January 22, 2003, eight days before the hearing. On that day, he took photographs of the home.

In regards to budgeting, Stoecker stated that he told appellants ways that DHS could help with managing their income. He suggested appellants use food stamps, but Carla told him that the food stamps had "been turned off." Stoecker further suggested that he help Carla refile for food stamps, but she stated that she would take care of it. According to Stoecker, Carla complained to him that she was having trouble budgeting because her husband would "spend nearly half his check even before he gave it to her, and that she was unable to control his spending habits." As a result, Carla believed that it would not be a good idea for Stoecker to help with budgeting. Later, Stoecker offered again to help with budgeting, but Carla replied that a member of her church who owned a business had volunteered to help, so Stoecker's services were not needed. Yet, Stoecker testified that appellants continued to remain in arrears in their rent. At the time of the hearing, they were two and a half months behind. Carla admitted to Stoecker that she had large outstanding phone bills that she felt she would never get paid off. According to Stoecker, Carla said that one of her phone bills was $500 and that they allowed a friend to turn on a second phone line in their home. The second phone line also had an outstanding balance of $500.

Stoecker testified that he was present for visitation with Carla, David, and the three children. Stoecker stated that during those visits, Carla gave most of her attention to A.B. Carla left J.C. by himself and prevented him from playing with his siblings. Stoecker further stated that Carla "pretty well kept telling [J.C.] to stop [playing with the others] because she was afraid that they would either kick A.B. [or] bump into A.B." Carla told J.C. to "get away" from A.B. She "would constantly yell at David that he wasn't helping her watch the kids. And there at the end of the visit, J.C. was just frustrated to where he really didn't even want to say goodbye to them. He would just pretty well sit in the corner, or sit in the chair and pout."

In regards to any of the issues DHS had attempted to address with appellants, Stoecker stated that appellants had made "no progress" on any issue. Stoecker said, "If we continue to offer

services to them, I feel they would not change. Every avenue I've tried to go down to help rectify their situation, they have either been unwilling to or told me that they have found other people that would help them with that. . . the situation would never change."

Charles Arnold, the appellants' caseworker, testified that DHS recommended that appellants' parental rights be terminated, that it was highly likely that the children would be adopted, and that people had already expressed interest in adopting the children. He stated that despite all of DHS's efforts to reunite the family, appellants had made no progress in their case plan including the conditions of the house, the arrears in bills, and the utilities being turned off for lack of payment, J.C.'s special needs, appellants' lack of cooperation with DHS, and Carla's bad attitude toward DHS. Arnold stated that he took photographs of appellants' home the night before the hearing and they were introduced into evidence. Arnold described Carla's poor relationship with J.C. in contrast to a more motherly relationship with A.B. Arnold said that appellants were currently $875 behind in her rent. However, Arnold believed that appellants should be able to pay their bills with both of them working. Arnold characterized David's employment history as "sketchy." Arnold feared that Carla would lose her job as a home health nurse with the White County Department of Health when it learned of the dependent-neglected status of her children.

In regards to visitation between appellants and the children, Arnold testified that on eight occasions the parents did not show for the visit. On two occasions the visit was cancelled because the children were sick. On one occasion, J.C. cancelled the visit because he "did not want to visit with his mother." On various occasions, the parents arrived late or left very early. Arnold said that he had visited in appellants' home that month and he "[sat] down on their couch and my legs [were] freezing cold because of the draft." Arnold remarked that although appellants "have a roof over their head[s]" it was not "suitable for children to live in."

Paula Clement served as a White County CASA supervisor in appellants' case and became involved in the case in November of 2001. She described a visit to appellants' home:

> [W]hen I got there, . . . [David] said they had a mouse in the house and he was going to set a trap to catch the mouse. And as I walked through the house and coming back, a rat that was at least a foot long in body, not including the tail, ran across my foot. It went

behind the stove, and it was so big it could not fit behind the stove. I had to make a very quick exit out of the house, because the door — the rat was between myself and the front door.

In another visit to the home, Clement asked Carla about the rat, and according to Clement, Carla said that they had set out poison for the rat, and in doing so, they killed the next door neighbor's cat.

Clement stated that during different visits to the house while A.B. was still in appellants' custody, Clement found several plastic bags in A.B.'s crib. She said, "[t]here were several items stacked in the baby's bed where I knew A.B. was sleeping." Clement described appellants' house as so filled with:

> clutter on the floor [that] you would have to literally step over it just to be able to find your footing. There were a remarkable number of Dr. Pepper bottles that were in the kitchen that are constantly there whenever I have gone. Food is left out it looks like for days. And one particular visit, [Carla] was frying chicken and using the baby's blanket to cover the chicken while she was cooking it because the flies were so bad that they would actually get on the chicken in between her trying to take it out. She had a baby's blanket on the meat that she was waiting to prepare. It was raw meat.

Clement stated that the last time she visited the house was two weeks before the hearing. At that time, Clement observed numerous five-gallon "tubs of wet clothes. [I] asked [Carla] about that, she said they had the clothes stored on a trailer outside. And it had rained and it had mildewed the clothes so they brought the clothes inside for her to be washing. But I couldn't tell the difference [between the clean clothes and the dirty clothes]. They all looked extremely dirty." Clement observed that the back bedrooms "seem[ed] to be in order" but that the rest of the house was very cluttered.

Clement expressed concern about Carla's failure to bond with J.C. and D.B. Clement noted that during visitation Carla "secluded herself with A.B." At times Carla would take A.B. to a corner and play with only him. On one occasion, Clement recalled, "I had brought it to [Carla's] attention that D.B. needed to [have his diaper changed]. It was obvious that he needed it changed. Instead of changing him, she chose to change A.B., who did not seem to need to be changed at the time." Carla had to be reminded again before she changed D.B.'s diaper. Clement said

that the entire time Carla changed A.B.'s diaper, she talked to him in a very loving and soothing manner although A.B. continued to wiggle. By contrast, when Carla changed D.B.'s diaper she became "extremely frustrated with him" and commented that he was acting like his father. During one visit, J.C. was required to finish his homework before participating in the visitation session. Nonetheless, J.C. tried the "entire time" to get his mother's attention. At one point, Carla slammed her hand down on the table next to J.C. and told him to finish his homework "if you want to have any kind of a visit." At the end of the visit, J.C. had become very angry with Carla, and he made the comment to her, "I'm mad at you. I'm mad at you all the time. I can't tell you why I'm mad at you because I'm afraid you'll make me mad."

Clement stated that she asked Carla to give her a copy of her bills and monthly income. Ultimately, Clement learned that appellants' monthly income in December totaled $1,327.00. Clement opined that this was a sufficient income for the couple. The only expenditures that appellants produced totaled $314 for December. Clement noted that appellants' truck was not reliable transportation for three children and that it could not accommodate three car seats. Carla told Clement that a businessman, Limbell Edwards, in Beebe was helping her with her budgeting. Clement stated that she spoke with Edwards but that he had told appellants that he did not have time to help with their budgeting. Clement commented on Carla's lack of cooperation with DHS, her argumentative nature with Arnold, and her negative attitude. Carla stated to Clement that her visits with J.C. in Little Rock, which would be for an hour, were not worth her "cranking up" her truck to go.

In reference to counseling sessions, Clement stated that Carla had only attended an intake session. Clement further testified that at one visitation Carla never made an effort to make physical contact with D.B., but she held A.B. the entire time. Yet, Clement still recommended termination of appellants' rights to A.B.

Carla testified that she had lived at her address in Beebe for a little over a year. She stated that she had received some child support payments for J.C. She further stated that she had been working for the department of health in Searcy for two months for approximately twenty hours per week at a rate of $5.85 per hour as a CNA. She said that David had been working for three weeks for a company in Cabot constructing metal buildings. She stated that she had all of the utilities except the telephone working in the

house. She further stated, "I think I've done pretty good so far, because all of our bills has been paid, they haven't been shut off." Yet, later in her testimony, she said that her combined phone bill for both lines totaled over $1,000. She also admitted that she was $875 behind in her rent. Carla further admitted that she had an outstanding balance on her gas bill. Carla stated that the back bedrooms in her house are not warm because she does not use them and because her landlord "has my heater that goes in that room. He just hasn't brought it to me."

Carla told the court, "I love my children dearly, all four of them, and I'd do anything in the world for all four of them." She stated that she showed the same amount of affection to each of them. Regarding the cleanliness of her home, she stated, "I do think there's a problem there, honestly, in a way, because I'm not a housewife. I do not like housework. But now, since that's what I do for a living, I've gotten to where that doesn't bother [me]." In reference to her laundry, she said, "I've got a clothes line hanging in the back room, in [J.C.]'s room, that we use. The clothes line out back, we don't use those on account of the dogs being out there because they've pulled my clothes off the line before." Carla also claimed that currently "there [were not] all sorts of appliances cluttered in my house." Yet, she admitted that she had old appliances in her yard and that they had extra scrap iron in the yard to sell. Carla told the court that on Saturdays she and David retrieved used appliances that others did not want. Then, they stored them at their home. She recognized that David had not completed his parenting classes.

Carla explained that J.C. was her oldest child and that R.M. was her next oldest child, who was in the custody of her father, Tommy McMasters. Carla stated that she had supervised visitation with R.M. every other Friday for one hour at the DHS office in Brinkley, Arkansas.

The court presented Carla with two sets of photographs, one set taken on October 14, 2002, and the other set taken on January 22, 2003. The court asked her if she could tell a difference in the cleanliness in her kitchen on October 14 and on January 22. She admitted that there is "honestly, very little" difference in the photographs. She reasoned that the dirty condition of her home was due to the fact that she did not have help cleaning it. Carla said that she did not have "time to do it. I work during the daytime. I come home. Sometimes I do some before I go to bed at night."

David Browning testified that he was the biological father of D.B. and A.B. He said that he was going to "make a good effort to keep [his] job." He admitted that he had known for a "long time now that the Department is wanting us to clean [our house]. The house is clean. The only thing left is a few dishes we ate out of and what I cooked out of last night. And a few clean clothes is in the bedroom that we haven't put away."

Brenda Crownover, J.C.'s therapist, testified that J.C. had been in treatment for approximately two years. J.C. began treatment at Centers in May of 2001, and he began with treatment homes in March of 2002. Crownover stated that J.C.'s need for treatment began while living with appellants. Crownover currently works with J.C. and his foster parents. Crownover testified, "[J.C.] is oppositional. He has difficulties in school. He needs a lot of supervision. In the past, he's had some suicidal behaviors and things of that nature. And he does need much structure." She also stated that J.C. was on medication and visits a psychiatrist monthly. Crownover testified that, even with J.C. "being in a two parent home where the parents are trained to be therapeutic foster parents, they still have a lot of difficulty with [J.C.] In regards to his best interest and him needing to continue in that type of placement for a while longer, he needs that structure." However, Crownover testified that J.C. is no longer suicidal and that he no longer displays psychotic tendencies. Crownover did not "think that [J.C.] would do better" if he returned to appellants' home. Yet, Crownover could not "say that [J.C.] would not be happier" if he returned to appellants' home.

J.C. testified outside the presence of others in the courtroom. He stated, "I'm not doing very good in school. . . . I don't want to go home because my mom is living in a place that I don't really like to live in, with no heat, no place to play except for in the front yard. And it is just not clean enough." J.C. also told the court, "I have been having a little trouble lately. The reason I think that is, well, I think I'm just not trying right now because I've got all this stuff just making me worry."

*Arkansas Code Annotated § 9-27-341*

Arkansas Code Annotated § 9-27-341(b)(3)(B)(i)(a) (Repl. 2002), provides that the trial court may terminate parental rights when "a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the

department to rehabilitate the home and correct the conditions that caused removal, those conditions have not been remedied by the parent." Pursuant to this statute, the trial court terminated Carla's parental rights as to J.C., and the trial court terminated Carla and David's parental rights as to D.B.

An order to terminate parental rights may be based upon the fact that a parent was found by a court of competent jurisdiction to have had his or her parental rights involuntarily terminated as to a sibling of the child. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)(a)(4). Pursuant to this statute, the trial court terminated Carla and David's rights as to A.B. based upon the fact that their parental rights were terminated as to D.B.

### Legal Analysis

After talking to appellants and visiting their home, DHS designed a case plan in an effort to rehabilitate appellants' home. On numerous occasions, appellants verbally agreed to comply with the plan. In providing services to appellants, DHS made 221 visits to the home. DHS assigned over ten case workers, social workers and aids, therapists, counselors, child-maltreatment assessors, and placement-team specialists to assist appellants in rehabilitating their home. In doing so, DHS compiled 425 pages of notations documenting conversations with appellants and visits to the home. In spite of the tremendous effort by DHS, appellants refused to comply with their case plan.

Appellants failed consistently for fourteen months in at least three ways to rehabilitate their home. First, appellants continued to maintain hazardous, unhealthy, and unsanitary living conditions in their house. Second, appellants exposed the children to actual, physical endangerment. Third, appellants demonstrated a painfully palpable lack of motivation to comply with the case plan. As a result, we cannot say that the trial court clearly erred in terminating appellants' parental rights.

First, appellants continued to maintain hazardous, unhealthy, and unsanitary living conditions in their house. When Paula Clement, a CASA supervisor, visited appellants' home, a rat "a foot long in body, not including the tail" ran across her shoe. The rat was so large that it could not fit behind the stove. It is no surprise that rodents lived in appellants' home as they continually left old food and trash on counter tops, furniture, boxes, and the

floor. Their home contained unimaginable amounts of junk and filth. Appellants filled their home with "trailer loads" of broken appliances, frying pans, and old, mildewed clothes. Case workers found knives, nails, and rags lying around the house. Even J.C. stated that there was no room for children to play at the house. A caseworker discovered plastic bags in the baby crib. During the four months that A.B. remained in appellants' custody after his birth, A.B. had to stay in his playpen if he was not at daycare. One day, a social worker observed Carla attempting to fry chicken in her kitchen. Because flies coated the chicken, Carla took A.B.'s only baby blanket and laid it over the raw meat. Social workers found cigarette butts and trash on the floor, hundreds of metal hangers on the floor, large stacks of dirty dishes, and mounds of wet, mildewed clothes in virtually every room of the house.

On two occasions, DHS workers spent several days "gutting" and cleaning appellants home. A crew from Harding University assisted in the volunteer effort to bring appellants' home to a liveable condition. The crew unloaded boxes, sorted junk, and disposed of numerous broken appliances and unusable parts. DHS recruited municipal employees to help in disposing over eight truck loads of trash from the home. After the crew finished its first overhaul of the home, a case worker returned less than a week later to discover that the home "looked as if we had never cleaned it." In the meantime, appellants had unloaded another flat-bed trailer full of junk into the home. Because appellants' landlord was prepared to evict appellants, DHS agreed to gut and clean the house a second time. Yet, in spite of these heroic efforts by DHS and the community of White County, appellants recreated the deplorable living conditions in their home.

DHS workers took photographs in October 2002 and January 2003 of appellants' kitchen and living environment. At the termination hearing, Carla admitted to the court that there was virtually no difference in the set of photographs, that her house was just as filthy at the time of the hearing as it was several months earlier.

Second, appellants exposed the children to actual, physical endangerment while they were in appellants' custody. When DHS made its first contacts with appellants, they were living out of a van with D.B. J.C. was not in their custody as he was an inpatient at a treatment facility. According to a family friend, D.B. spent most of his time in his car seat. D.B. had "head lice the size of ants." He was sick, and appellants had taken him to the emergency room for

treatment. At the hospital, appellants received antibiotics for D.B. but chose to throw them away because they had no refrigeration for the medicine.

Later, when appellants moved into their rent house in January 2002, appellants' had only one source of heat, a small electric heater. Appellants had no gas turned on in the house. The electric heater was clearly insufficient to warm the three-bedroom home. Nonetheless, after A.B. was born, appellants chose to place his crib under a window with the heater on the other side of the room. A DHS worker visited the home on a very cold day and reported that she found no blankets for the baby, only light sheets in the crib. The bedroom had two entrances with sheets covering the doorways. As a result, it was impossible to retain heat in the bedroom.

A.B. was born with a sleeping disorder, and doctors required A.B. to wear a heart monitor at all times. In spite of A.B.'s special needs, appellants continued to leave the baby with a neighbor who DHS warned was incapable of caring for the baby. After visiting the neighbor, DHS advised appellants that the neighbor was an inappropriate babysitter because her cure for a child's fever was to hold the child in front of an air conditioner. Additionally, DHS warned appellants that police had been called to the neighbor's home for numerous domestic disputes.

Third, appellants demonstrated a painfully palpable lack of motivation to comply with the case plan. Carla, and especially David, failed to maintain employment. Even when one of them secured employment, he or she rarely worked a full-time schedule. David failed to complete his parenting classes although DHS offered the classes to him in his home for his convenience. Regardless, he chose to sleep through the classes. Although Carla completed her parenting classes, she would not attend her counseling sessions. She attended only one counseling session, which was an intake. Appellants were "no shows" on at least eight scheduled visits with their children. On several other occasions appellants arrived late or left very early. During the visits, Carla demonstrated a severe lack of bonding with the two older boys, J.C. and D.B. Finally, in spite of DHS and volunteers' efforts to gut and clean appellants' home on two separate occasions, appellants managed to recreate their original, deplorable conditions.

■ We distinguish this case from *Trout v. Arkansas Dep't of Human Servs.*, 84 Ark. App. 446, 146 S.W.3d 895 (2004).[1] In *Trout, supra,* this court reversed the Pulaski County Circuit Court's decision to terminate Amanda Trout's parental rights. During the period that DHS provided services to Trout, she made valuable, intermittent progress. In one year, Trout divorced her abusive husband, completed parenting classes, began rehabilitative services, obtained an appropriate home and transportation, addressed her medical problems, obtained employment, and commenced counseling. On the other hand, in the case at bar, multiple case workers testified that, in spite of DHS's efforts, appellants had made no progress in rehabilitating the home.

■ In *Dinkins v. Arkansas Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001), our state supreme court reversed our decision, *Dinkins v. Arkansas Dep't Human Servs.*, 71 Ark. App. 451, 34 S.W.3d 366 (2000), overturning the Ashley County Chancery Court's termination of Tiffany Dinkins's parental rights. In *Dinkins,* the mother similarly exposed her children to environmental hazards. In affirming the chancellor, our state supreme court noted that Dinkins's home "was filthy. Garbage cans were overflowing with trash and dirty diapers; the kitchen smelled of soured food, and dirty pots and pans cluttered the sink; dirty clothes and 'unidentifiable debris' were found on the floor in each room." In addition, the children suffered physical abuse. In this case, although appellants' children were not physically beaten, appellants physically endangered the children with a lack of medication, a lack of heat, and exposure to items that could have seriously injured or killed them, such as plastic bags in the baby's crib, sharp knives on the floor, and a foot-long rat in the house.

### Conclusion

As this is a matter involving the welfare of young children, we must give great weight to the trial judge's personal observations. *Ullom, supra.* Here, the trial judge had the unique opportunity to see and hear each of the witnesses. Over a period of fourteen months, the trial court conducted a total of ten hearings, viewed numerous photographs of appellants' home, heard eleven witnesses testify thirty-eight times, and issued at least a dozen

---

[1] We note that there is a petition for rehearing and a petition for review pending.

orders before concluding that appellants should not be allowed to maintain parental rights to the children.

Just as the trial judge stated, this is not a case about terminating appellants' rights because they are poor. To the contrary, appellants' rights were terminated because they have demonstrated over a lengthy period that they are incapable of creating or maintaining an environment that is safe and clean for children. We recognize that appellants' impoverished lifestyle does not prevent them from cleaning their house. Pursuant to our review, we viewed the photographs of appellants' home, which were introduced as exhibits at the hearings. These photographs confirm the testimony presented by DHS that appellants' home was not simply unkept but rather unsafe, filthy, and environmentally unacceptable for children.

Given our deferential standard of review, we are not left with a definite and firm conviction that a mistake has been made. Undoubtedly, the evidence reveals that two of the children were adjudicated dependent neglected and that they had been out of the home for over a year. In addition, DHS workers testified that appellants had made "no progress" in complying with their case plan. This provided the trial court with convincing evidence to terminate appellants' parental rights. *See Walters v. Arkansas Dep't of Human Servs.*, 77 Ark. App. 191, 72 S.W.3d 533 (2002) (holding that even though Walters had made some progress, she was still not able to adequately care for her children). In the case at bar, no reasonable person could say that the trial court clearly erred in terminating appellants' parental rights.

Affirmed.

STROUD, C.J., BIRD and VAUGHT, JJ., agree.

HART and ROAF, JJ., dissent.

ANDREE LAYTON ROAF, Judge, dissenting. I would reverse and remand this case so that continued services toward the goal of reunifiying appellants with their three children can be provided.

The appellants, who are both poor and "hoarders," first came to the attention of DHS when they were homeless and sought help. Throughout the course of this case, the strongest allegations against appellants in regard the mistreatment of the children themselves had to do with the occasional use of inappropriate babysitters and lack of cleanliness. There was additional

evidence presented about the oldest child's emotional problems, the younger boy allegedly not "speaking" and the baby being "congested" due to lack of heat, but there was no evidence attributing the first two conditions to appellant's care of the children. There was no evidence of physical abuse, drug-use problems, or significant medical neglect of the children at any state of the proceedings.

At the termination hearing, the trial court in essence found that appellants had not made sufficient improvement toward cleaning their home. After viewing pictures taken of the home just a few weeks prior to the termination hearing, the court noted that the Brownings' home was "virtually in the same unacceptable condition." However, I agree with appellants' contention that the court's ruling is clearly erroneous because there is a lack of evidence that the home was unsafe for the children. The evidence, at best, would only minimally support termination as to the infant in this case. There was some testimony that the clutter and junk would make it unsafe for the infant to crawl around. With that testimony in mind, there was no evidence presented that the home would be unsafe for the two older children. In fact, the primary safety issue DHS cites in its brief is an incident where a CASA worker observed a "rat," which DHS embellishes by referring to this incident as rat and mouse "infestation."

Alternatively, DHS presents the Brownings' inability to budget and failure to complete the case plan and urges this court on its *de novo* review to affirm the case on this basis. DHS points out that Carla has refused budgeting services, has only attended one counseling session, and has missed eight visits with her children. DHS argues that this failure to comply with DHS's recommendations demonstrates an indifference to rectifying the situations leading to the removal of the children. In the cases discussing indifference, this court has considered repeated failure to correct underlying problems. *See Ullom v. Ark. Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000) (continued physical abuse to child after it was removed from the home constituted manifest indifference to remedying the circumstances warranting removal). Appellants' two older children were originally removed from the home because appellants were homeless and did not have a refrigerator in which to keep one child's medication. Since their removal, appellants have maintained a stable home up until the time of the termination hearing. Moreover, Carla has obtained employment as a CNA at the Searcy Health Department; has completed parenting

classes; had all of her utilities, except for a telephone, turned on; and attempted to rectify circumstances with the home when pointed out to her. Although Carla refused DHS's assistance with budgeting, there was testimony that she contacted one of her church members to assist her with a budget. The testimony also shows that while Carla missed visits with her children on some occasions, she otherwise visited them consistently throughout the duration of this case. In this case, there was substantial progress, rather than evidence of manifest indifference. *See Trout v. Arkansas Dep't of Human Servs.*, 84 Ark. App. 446, 146 S.W.3d 895 (2004).

Finally, while the description and the photographs of the appellants' house are indeed distressing, the evidence presented falls short of demonstrating either that appellants are unfit or that it is in the best interest of these children to terminate their parental rights. *See J. T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997).

HART, J., joins.