## Nakia BAKER *v.* ARKANSAS DEPARTMENT OF HUMAN SERVICES

99–526 8 S.W.3d 499

Supreme Court of Arkansas
Opinion delivered January 13, 2000

*Blackmon-Solis & Moak, L.L.P.,* by: *DeeNita Moak,* for appellant.

*David K. Overton,* for appellees.

*Kathleen O'Connor,* Attorney Ad Litem for appellee minors.

DONALD L. CORBIN, Justice. Appellant Nakia Baker appeals the judgment of the Pulaski County Chancery Court terminating her parental rights to her children D.R., age 8, and C.R., age 6. For reversal, Appellant argues that the chancellor erred: (1) in finding that there was sufficient evidence to terminate her parental rights, and (2) by not placing the children with their maternal grandmother. Counsel for Appellant also seeks attorney's fees on appeal. The payment of such fees presents a significant issue in need of clarification or development of the law; thus, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(5). We affirm.

## Facts and Procedural History

Appellant's minor children were taken into custody by Appellee Arkansas Department of Human Services ("DHS") on April 29, 1997. An emergency hearing was held on May 7, 1997, and the chancery court found that DHS had probable cause to bring the children into foster care. Evidence was introduced that Appellant had left the children with a friend, but then failed to return and pick them up. There was also evidence that C.R. had reported being sexually abused by Appellant's ex-boyfriend, who is also the custodial father of Appellant's two minor daughters. The chancellor ordered Appellant to submit to a psychological evaluation to determine what type of services, if any, she may need. Appellant was also ordered to attend parenting classes, submit to random drug screens, and obtain stable housing and employment.

An adjudication hearing was held on June 23, 1997, and the record reflects that there was testimony by the children involving allegations of sexual abuse. There was also testimony from the children's foster mother regarding the children's sexualized behavior, as well as the emotional problems they were experiencing. The

chancellor found that the minor children were dependent-neglected and ordered that they remain in the custody of DHS. The court continued her orders from the emergency hearing, and further ordered Appellant to attend outpatient counseling with her children. At the conclusion of the hearing, the court specifically warned Appellant to cooperate with DHS or face losing her children permanently.

In response to the chancellor's orders, DHS instituted a family preservation case plan for Appellant and her children with the goal established as reunification. A review hearing was held on October 13, 1997, to determine if Appellant was complying with the chancellor's orders. It was revealed that Appellant had failed to attend outpatient counseling with either child after repeated request by the therapist. Testimony by the DHS caseworker also indicated that Appellant had missed two separate appointments for drug and alcohol assessments. C.R.'s therapist testified that the child was suffering from post-traumatic stress disorder and suffered from a history of sexual abuse, as well as a history of neglect. The therapist also testified that if the goal in the case was reunification, it would be necessary for the primary care giver to participate in therapy sessions.

A second review hearing was held over four months later on March 2, 1998. C.R.'s therapist testified that Appellant had started attending her son's therapy sessions in January. The therapist also testified that C.R. required incredible structuring and consistency, as well as constant supervision due to his tendencies to inappropriately touch other children.

Appellant testified that she was not currently employed due to health problems. She further testified that since September 1997, she had held four different jobs, the longest one was for a month and a half. Appellant admitted that she had not become involved in C.R.'s therapy until January, but blamed her lack of participation on the fact that she was depressed. She asked the chancellor to give her some more time to prove that she could be a productive parent. The chancellor agreed to Appellant's request and set the termination hearing for five months later. The chancellor, however, cautioned Appellant that termination of her rights would become the goal if Appellant failed to make any progress in the case.

The termination hearing was subsequently held on August 10 and September 14, 1998. The children's foster home case manager testified that of the eighteen visitations scheduled, Appellant missed ten of those visits. Furthermore, Appellant frequently failed to notify anyone that she was not showing up for visitation, leaving her children with the expectation that they were going to visit with their mother. Both the case manager and the children's foster mother testified that after Appellant failed to show up for visitation both children would become upset. D.R. tended to bottle his emotions up, while C.R. would become extremely aggressive, and it would sometimes take days to calm him down. During one of the visits that Appellant attended, she admitted to the case manager that during her previous visit, she had been in a bad mood and had taken some Valium and that people in the car with her had been smoking marijuana.

C.R.'s therapist testified that Appellant had become more involved in the child's therapy sessions until the middle of May 1998; after that date her attendance declined. The therapist admitted that he saw some improvement in Appellant's parenting skills, but further explained that such improvement was often short-lived, and he would then see recurrences of the same problems. He also testified regarding examples of situations where Appellant exhibited poor judgment in dealing with C.R., including bringing her fiancé and his daughter to a therapy session. Finally, the therapist testified that after a session attended by both Appellant and her fiancé, he discovered a substance he believed to be crack cocaine. Appellant, however, denied that it belonged to her or to her fiancé.

A representative from Suspected Child Abuse and Neglect ("SCAN") testified regarding her agency's repeated attempts to offer in-home parenting services to Appellant. As of February 1998, Appellant had only participated in two sessions, even though SCAN had made ten attempts to schedule appointments. The representative also testified that SCAN is only required to make two attempts at arranging parenting classes before a parent is put on an inactive list. Finally, the SCAN representative reported that the house Appellant was residing in had no stove, no refrigerator, and no beds and was in need of major repairs. Appellant testified that she had missed visitation and therapy sessions due to health problems, as well as transportation problems. She blamed her inability to arrange parenting classes on conflicts with her schedule. She also argued that

she was unable to avail herself of the parenting classes because SCAN discontinued the program. Appellant admitted, however, that after the SCAN program ended, her DHS caseworker provided her with a referral to Next Step Teen Parenting.

Appellant also alleged that the DHS caseworker failed to return her calls. The DHS caseworker testified, however, that he repeatedly attempted to contact Appellant, but that her phone was usually disconnected and the pager number she provided to him was incorrect. He also testified that he was aware of only two drug screens performed on Appellant, both of which were negative, even though he set up several other appointments for the drug screens and arranged transportation for Appellant. The caseworker concluded his testimony by recommending the termination of Appellant's parental rights. At the conclusion of the hearing, a report from Bridgeway Hospital was also admitted after C.R., who was five years of age at the time, had tried to hang himself with the belt from his robe. During the four weeks that C.R. was in Bridgeway, Appellant did not visit him at all, even after the staff encouraged her to visit the child.

After taking the matter under advisement, the chancellor issued a letter opinion on October 7, 1998, terminating Appellant's parental rights pursuant to Ark. Code Ann. § 9-27-341 (Supp. 1997). The court recognized that Appellant had made some efforts to comply with her previous orders, but that such attempts had been inconsistent and none of the orders sought to rehabilitate her were ever completed. The chancellor further stated that Appellant's failure to visit with the children on a consistent basis had hurt both children, as evidenced by C.R.'s suicide attempt. The chancellor specifically found as follows:

> The Court cannot say that Ms. Baker has made a good faith effort to try to rehabilitate herself or that she would suddenly begin following the Court's orders and actually rehabilitate herself within a reasonable amount of time consistent with both children's health, safety, and welfare. Both children have serious behavior problems, particularly C.R., which must be dealt with consistently and daily. Ms. Baker has shown a complete lack of understanding as to her children's needs and her level of participation.

An order terminating Appellant's parental rights was then entered on January 12, 1998. This appeal followed.

## Standard of Review

Our law is well settled that when the burden of proving a disputed fact in chancery is by clear and convincing evidence, the question that must be answered on appeal is whether the chancery court's finding that the disputed fact was proven by clear and convincing evidence was clearly erroneous. *J. T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997); *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). Clear and convincing evidence is that degree of proof that will produce in the factfinder a firm conviction as to the allegation sought to be established. *J. T.*, 329 Ark. 243, 947 S.W.2d 761. In resolving the clearly erroneous question, we must give due regard to the opportunity of the chancery court to judge the credibility of witnesses. *Id.*

## Termination of Appellant's Parental Rights

For her first point on appeal, Appellant argues that there was not sufficient evidence to terminate her parental rights. Appellant alleges that the chancery court's finding that she failed to complete any of the orders aimed at reunification was a blatant misstatement of the history of the case. Appellees DHS and the minor children, through their attorney *ad litem*, argue that there was clear and convincing evidence to prove that DHS put forth meaningful efforts to rehabilitate the conditions that led to the removal of the children, but that Appellant failed to avail herself of those services. We agree with Appellees.

Section 9-27-341 requires that an order terminating parental rights must be based on clear and convincing evidence. Subsection (b)(2) sets forth the grounds for terminating parental rights, which include in part:

> (A) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months, and, despite a meaningful effort by the Department of Human Services to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent.

This court has held that when the issue is one involving the termination of parental rights, there is a heavy burden placed

upon the party seeking to terminate the relationship. *J. T.*, 329 Ark. 243, 947 S.W.2d 761; *Anderson*, 310 Ark. 633, 839 S.W.2d 196; *Bush v. Dietz*, 284 Ark. 191, 680 S.W.2d 704 (1984). Termination of parental rights is an extreme remedy and is in derogation of the natural rights of the parents. *Wade v. Arkansas Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999); *J. T.*, 329 Ark. 243, 947 S.W.2d 761; *Anderson*, 310 Ark. 633, 839 S.W.2d 196. This court recognized in *J. T.*, however, that parental rights should not be allowed to continue to the detriment of the child's welfare and best interest. To illustrate that the best interest of the child is the primary consideration in these cases, this court in *J. T.* stated:

> While we agree that the rights of natural parents are not to be passed over lightly, these rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. Parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.

*Id.* at 248, 947 S.W.2d at 763. Subsection (a) of section 9-27-341 sets forth in relevant part the intent behind the law governing termination of parental rights:

> The intent of this section is to provide permanency in a juvenile's life in all instances where the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and it appears from the evidence that return to the family home cannot be accomplished in a reasonable period of time.

Here, Appellant's repeated failure to comply with the chancery court's orders designed to remedy the problems that warranted removal in the first place is the exact type of situation this statute was designed to remedy. In her attempt to argue that the chancery court misstated the history of this case, Appellant sets forth examples of efforts she made to comply with the court's orders. What Appellant fails to realize, however, is that her mere attempts constituted nothing more than sporadic compliance at best. Appellant has failed to show any consistent improvements in terms of visitation, employment, or housing. In fact, her pattern of inconsistent visitation continued to harm her children even while they were not in her custody. In *Crawford v. Arkansas Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997), this court upheld the termination of parental rights in a case where the evidence indicated that the

parent failed to maintain reasonable contact with his sons for almost a year while they were in protective custody. Likewise, Appellant has failed to maintain significant contact with her sons over the past year or to remedy the other problems that led to the removal of her children from her home.

 Appellant's attempts to place blame for lack of improvement with DHS is also unpersuasive. Appellant's testimony regarding her attempts to comply with the chancellor's orders conflicted with the testimony of therapists and caseworkers. This court has said that we will defer to the chancery court's evaluation of the credibility of witnesses. *Wade*, 337 Ark. 353, 990 S.W.2d 509. Here, the chancellor found that the testimony of the therapists and caseworkers was more credible than the testimony of Appellant. A review of the record combined with the deference granted to the chancellor establishes that such a finding was not clearly erroneous.

 Appellant also argues that the chancery court did not find that she was an unfit parent, and thus, her rights should not be terminated. Her argument ignores this court's decision in *J.T.*, 329 Ark. 243, 947 S.W.2d 761, where we held that the court's finding that the appellant was unable to be the type of parent that her child needed and was unable to learn how to be that parent was a sufficient finding of her unfitness. Testimony throughout the hearings held in this case repeatedly indicated that Appellant's children needed consistency and supervision above all else. Appellant's actions, or lack thereof, evidenced the fact that she was unable to provide her children with either consistency or supervision. Again, a review of the record does not indicate that the chancellor erred in finding that Appellant was unable to provide the type of setting that her children required. Based on the foregoing, we affirm the chancellor's order terminating Appellant's parental rights.

### Denial of Placement with the Maternal Grandmother

For her second point on appeal, Appellant argues that it is standard practice in dependency-neglect proceedings for family members to be considered as placements for children who would otherwise enter or remain in the foster care system or be adopted outside of their biological parent's families. As the children's attorney *ad litem* points out, however, Appellant failed to make any

formal motions requesting that the children be placed with her mother. Furthermore, the maternal grandmother never intervened in this action to seek placement of the children with her.

■ This court held in *Anderson*, 310 Ark. 633, 839 S.W.2d 196, that when the circumstances reveal a studied indifference to the child, termination must result. Based on that holding, it would be illogical for this court to now hold that the chancery court erred in refusing to place the children with the maternal grandmother when the evidence revealed an indifference to the children's welfare on her part. The chancellor heard testimony regarding the maternal grandmother's refusal to accept placement of the children when DHS initially took them into custody. The grandmother attributed her initial refusal to using "tough love" on her daughter so that she would work to get her children back. There was also evidence presented at the hearings, however, that revealed a lack of visitation on the grandmother's part while the children were in foster care. The DHS case manager testified that while the grandmother agreed to accept placement of the children, she did not appear to really want the responsibility of dealing with the children. Finally, even when the grandmother testified about her willingness to take the children, she focused the situation on her daughter's needs, not the needs of the children.

■ In matters involving the welfare of young children, the appellate court gives great weight to the trial judge's personal observations. *In re Adoption of K.F.H. and K.F.H.*, 311 Ark. 416, 844 S.W.2d 343 (1993); *M.T. v. Arkansas Dep't of Human Servs.*, 58 Ark. App. 302, 952 S.W.2d 177 (1997). The chancellor relied on the above-enumerated testimony in declining to place the children with their maternal grandmother. Obviously, the chancellor had the benefit of witnessing first hand the grandmother's behavior and participation during the pendency of this case; therefore, we cannot say she clearly erred in refusing to place the children with the maternal grandmother.

### Payment of Reasonable Attorney's Fees

For her third point on appeal, Appellant argues that the chancellor erred in denying the motion for attorney's fees for work performed on this appeal. Appellant's counsel in the present matter

was appointed by the chancellor pursuant to Ark. Code Ann. § 9-27-316 (Repl. 1998), which requires appointment of counsel for indigent parents in termination cases. The order appointing counsel to represent Appellant specifically stated that the appointment was for all stages of the proceedings, through appeal. Counsel filed a motion for attorney's fees with the chancery court on June 28, 1999. The chancellor refused to pay Appellant for any work performed after the notice of appeal was filed, because she found that her court no longer had jurisdiction over the case.

▉ Appellant argues that requiring counsel to represent an indigent parent *pro bono* in a termination case amounts to an unconstitutional taking. We agree. This court has held that the services of an attorney are a specie of property subject to Fifth and Fourteenth Amendment protection. *Arnold v. Kemp*, 306 Ark. 294, 813 S.W.2d 770 (1991). In *Arnold*, this court held that the appointment of counsel in criminal cases results in a taking of the appointed counsel's property for which he must be justly compensated. *Id*. We recognize that termination cases are civil in nature. The principles that require payment of attorney's fees for representing an indigent criminal defendant, however, are applicable to termination cases as well. *See Phillips v. Arkansas Dep't. of Human Servs.*, 64 Ark. App. 201, 980 S.W.2d 276 (1998). It would, therefore, be unconstitutional for the chancellor to appoint counsel to represent Appellant, and then deny that counsel reasonable payment for services rendered.

▉ Counsel for Appellant previously filed a motion with this court to withdraw as counsel on appeal, or in the alternative for attorney's fees. We denied her motion to withdraw as counsel. We reserved ruling on the motion for attorney's fees. In accordance with the foregoing opinion, we now request counsel for Appellant to submit an affidavit to this court setting forth the following information: (1) the date of appointment; (2) the court which appointed counsel; (3) the number of hours expended by counsel in research, court appearances, and preparation of pleadings and briefs; (4) counsel's customary rate of compensation in similar cases; (5) the customary rate of compensation in similar cases of attorney's in the community; (6) expenses incurred by counsel which are directly attributable to the case; (7) the experience of counsel in the representation of indigent parents; and (8) the relative complexity of the

case. This affidavit shall be filed no later than thirty days after the issuance of the mandate.

Affirmed.

GLAZE, J., dissents.