Bobby and Angie ULLOM *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

99-816                                        12 S.W.3d 204

Supreme Court of Arkansas
Opinion delivered March 9, 2000

*F. Lewis Steenken*, for appellant.

*Frank Arey*, Chief Counsel and *Johnny E. Gross*, Office of Chief Counsel, for appellee.

RAY THORNTON, JUSTICE. Appellants, Bobby and Angie Ullom, appeal from the judgment of the Benton County Chancery Court terminating their parental rights to their three-year-old child, D.U. For reversal, appellants argue that the chancellor's findings were not supported by clear and convincing evidence. In a three-to-three decision, the court of appeals affirmed the chancellor.[1] We accepted review of this case and affirm the trial

---

[1] *See Ullom v. Arkansas Dep't of Human Servs.*, 67 Ark. App. 77, 992 S.W.2d 813

court.

## Facts and Procedural History

Appellants are the parents of D.U. born August 1, 1996. On August 21, 1996, D.U. was taken to St. Mary's Hospital. While at the hospital, it was determined that she had a spiral fracture of her left arm. Appellants could not explain how the accident occurred. Suspecting that D.U. had been abused, the hospital contacted appellee, the Arkansas Department of Human Services, who took the child into custody.

On September 3, 1996, a probable-cause hearing was held in the matter. At the probable-cause hearing, Michelle Murphy, an employee of the Department of Human Services testified that on the evening of August 21, 1996, she saw D.U. at the hospital and investigated the circumstances surrounding her injury. Ms. Murphy noted that appellants were unable to offer an explanation as to how the injury occurred and, according to the doctor, a three-week-old child is not mobile enough to sustain a spiral fracture on her own.

Bobby Ullom also testified at the hearing, stating that on August 20, 1996, he was at his parents' home along with his wife and daughter. He noted that while they were there his eighteen-month-old nephew and nine-month-old niece were "constantly coming up [to D.U.] and kissing on her and pulling on her..." Mr. Ullom further testified that they left his parents' home between 8:30 and 9:30 because D.U. was "fussy" and that his wife was up with D.U. all night but that they thought the baby had "gas." He also stated that the next day when he got home from work his wife said D.U. had been "fussy" all day. When he went to pick her up he heard a "pop," D.U.'s arm fell, and she began to scream. Finally, Mr. Ullom stated that he had no explanation for the child's injury.

On September 17, 1996, an adjudication hearing was held. Angie Ullom testified that she did not know how D.U. was injured on August 21, 1996, but that she knew D.U. could not have caused the injury herself. Mrs. Ullom further testified that the only people

that had contact with D.U. on that day were she and Mr. Ullom. Finally, she noted that the broken arm caused D.U. intense pain.

Bobby Ullom reiterated his previous testimony from the probable-cause hearing at this hearing. Mr. Ullom also stated that he had had trouble controlling his anger when he was growing up and that he was abused by his stepmother when he was younger. Finally, Mr. Ullom, once again, noted that he did not know how D.U. was injured.

The chancellor determined that the preponderance of the evidence showed that the child's injury was caused by abuse and the child was found to be dependent-neglected. Appellee retained custody of D.U., and appellants were granted supervised visitation.

Appellants attended parenting classes, participated in counseling, and continued supervised visitation with D.U. pursuant to the case plan developed by appellee. After completing the appellee's requirements, and pursuant to a court order following a review hearing, appellants were allowed to have unsupervised visitation at their home.

On February 8, 1997, at the initial unsupervised visit with appellants, D.U. was again injured, sustaining extensive bruising on and around her face. Appellants claimed that a toy had fallen on her face causing the injury. D.U. was taken to Bates Hospital by her foster mother.

On February 18, 1997, appellee filed a petition to terminate appellants' parental rights. Appellee sought termination of appellants' parental rights pursuant to Ark. Code Ann. § 9-27-341 (Repl. 1997)[2]. Specifically, appellee alleged that:

> (a) the parents of the juvenile have abandoned the juvenile, or have executed consent to termination of parental rights, subject to the court's approval, or adoption of the juvenile or the juvenile court has found the juvenile victim dependent-neglected as a result

---

[2] We note that this statute has been amended numerous times since the beginning of this case. Specifically, the statute was amended in the 1995 replacement volume, in the 1997 replacement volume, and once again in the 1999 replacement volume. However, we also note that the substance of the statute has not been amended but that changes have been made to the numbering of the statutory provisions. We have used the text of the 1997 replacement volume because that was the statutory language relied upon by the chancellor in this case.

of neglect or abuse that could endanger the life of the child, sexual abuse, or sexual exploitation, and which was perpetrated by the juvenile's parent or parents.

(b) the minor child, D.U., has been adjudged to be a dependent-neglected child and currently resides in the care and custody of the Arkansas Department of Human Services pursuant to order of the Benton County Chancery Court, Juvenile Division.

(c) that, subsequent to the filing of the original petition for dependency–neglect, other factors or issues arose which demonstrate that return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors, or rehabilitate the parent's circumstances, which prevents return of the juvenile to the family home.

A termination hearing was held on May 16, 1997. Dr. Barry Allen, who treated D.U. on eleven occasions, testified that he was called to the hospital to examine D.U. in August of 1996. He also testified that according to the x-rays she had a spiral fracture, and noted that this type injury is usually caused by a "twisting motion." Dr. Allen further stated that D.U. was most likely not injured by the actions of a eighteen-month-old child or a nine-month-old child and could not have injured herself to this degree. He questioned the explanation given by appellants, that she had been passed around by relatives the night before they brought her into the hospital and that when they picked her up the next day they heard a popping sound, noting that this was not consistent with a spiral fracture. Dr. Allen also testified that the leading cause of this type of injury in children under the age of three was abuse and that a spiral fracture would be an injury causing severe pain. Finally, he testified that his primary diagnosis was maltreatment syndrome.

Next, Dr. O.L. Henderson testified that causing a spiral fracture would require a great amount of force and that most fractures of this nature occur in children because someone has twisted the child's arm. He stated that this type of injury could have caused either nerve or blood vessel damage, a loss of the limb, and a remote possibility of death.

Finally, Dr. Charles Akin testified that he had seen D.U. on February 8, 1997, when she was brought in to the emergency room

at Bates Hospital for treatment of her second injury. He stated that when he treated D.U., she had "fresh bruising" around her left brow, around her left eye, the left side of the nose, and the cheek, as well as bruising on the right side of her face. Dr. Akin noted that the explanation given for the injury was that a toy had been dropped on the child's face. He expressed his opinion, after examining the toy, that merely dropping the toy could not have caused the type of bruising suffered by D.U. Dr. Akin further noted that if the injury had occurred as explained by appellants the injuries would not have been to both sides of the face.

The termination hearing was concluded on January 2, 1998. Bobby Ullom once again testified at this hearing. However, his testimony regarding the cause of the August 21, 1996, injury changed. Specifically, he testified that when he went to get D.U. from her seat her arm became entrapped in the safety strap and he thought that this could have caused the injury.

On January 23, 1998, the chancellor entered an order terminating appellants' parental rights. The chancellor found:

> (1) that it [is] contrary to the child's best interest and welfare to return her to the parental care and custody of Bobby Ullom and Angie Ullom, and further finds that the Department of Human Services has proven by clear and convincing evidence that the minor child was dependent-neglected as a result of unexplained abuse or neglect that could endanger the life of the child and was perpetrated by the juvenile's parents;

> (2) that the Department of Human Services has shown by clear and convincing evidence that subsequent to the filing of the original petition for dependency-neglect, other factors or issues arose which demonstrate that the return of the juvenile to the family home is contrary to the juvenile's health, safety, or welfare, and that, despite the offer of appropriate family services, the parents have manifested the incapacity or indifference to remedy the subsequent issues or factors, or rehabilitate the parent's circumstances, which prevents return of the child to the family home.

It is from this order that appellants appeal. They raise one point on appeal and we affirm the chancellor.

*Termination of Appellants' Parental Rights*

■ Appellants contend that the findings supporting the chancellor's order terminating their parental rights was not based on clear and convincing evidence. We have held that when the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship. *J. T. v. Arkansas Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Wade v. Arkansas Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999). Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* The facts warranting termination of parental rights must be proven by clear and convincing evidence. In reviewing the trial court's evaluation of the evidence, we will not reverse unless the court's finding of clear and convincing evidence is clearly erroneous. *Baker v. Arkansas Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). Clear and convincing evidence is that degree of proof which will produce in the factfinder a firm conviction regarding the allegation sought to be established. *Id.* In resolving the clearly erroneous question, we must give due regard to the opportunity of the chancery court to judge the credibility of witnesses. Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations. *Id.*

■ ■ Appellants argue that the termination was not proper because D.U., was not "out of the home" for more then twelve months as required in Ark. Code Ann. § 9-27-341. Because this argument was not presented to the chancellor at trial, we need not address its merits on review. *See Burke v. Strange*, 335 Ark. 328, 983 S.W.2d 389 (1998). However, we do note that D.U. was removed from the home on September 17, 1996, the petition for termination of appellants' parental rights was filed on February 18, 1997, and the termination order was not entered until January 23, 1998. Accordingly, the child had clearly been out of the home for more than twelve months at the time the termination order was entered.

■ Appellants also argue that termination of parental rights was not appropriate because appellee failed to pursue meaningful efforts to rehabilitate their home. We cannot agree with appellants' contention. Appellee devised a plan in September of 1996 for

reunification of the family which was followed until the second injury occurred in February of 1997. Specifically, appellee provided appellants with counseling and parenting classes and appellants were allowed visitation with D.U. However, following appellants' participation in the counseling and parenting classes, D.U. suffered a new injury at her initial unsupervised visit with appellants. It was at that time that appellee changed the goal of its plan from reunification to termination of appellants' parental rights. We also note that on both occasions in which D.U. was injured appellants were the only people with the child and neither parent had a plausible explanation for her injuries. Thus, we find that there was clear and convincing evidence that appellee pursued meaningful efforts to rehabilitate the home and that appellants chose to ignore or failed to benefit from the services provided by appellee. Thus, we find no error and affirm the chancellor.

◼ Next, appellants argue that the chancellor erred when he found that appellants manifested an incapacity or indifference to remedy the subsequent issues or factors that demonstrate that return of D.U. to the family home would be contrary to her health, safety, or welfare pursuant to Ark. Code Ann. § 9-27-341. Once again we cannot agree with appellants. The evidence shows that appellants' actions demonstrated a pattern of abuse that is contrary to the health and safety of D.U. Specifically, as the medical evidence revealed, when D.U. was only twenty-one-days-old appellants caused her to suffer a spiral fracture and then, even after receiving family services provided by appellee, on the very next occasion in which they were alone with D.U. she suffered bruising to both sides of her face, injuries for which no satisfactory explanation was provided. The chancellor found that return of D.U. to the family home would be harmful to her health and safety and that appellants manifested an indifference to remedy the situation. Under these circumstances, we cannot say that the chancellor's findings were not based upon clear and convincing evidence. Therefore, we affirm.

◼ Finally, appellants contend that the chancellor's findings were erroneous because it was not established by clear and convincing evidence that D.U.'s injuries endangered her life. The medical evidence established that the injuries suffered by D.U. were severe and very painful. Further, Dr. Henderson testified that the spiral fracture could have been life-threatening. Because we give great deference to the chancellor on witness credibility we must assume

that the chancellor found D.U.'s injuries to be life-endangering. Accordingly, we affirm the chancellor's findings.

Affirmed.

SMITH, J., concurs.

LAVENSKI R. SMITH, Justice, concurring. I join the court's decision to affirm but for different reasons than the majority. The majority erroneously holds that Dr. O.L. Henderson's testimony supports a finding that D.U. suffered injuries that endangered her life. To the contrary, Dr. Henderson, though certainly opining that the injury to D.U.'s arm was serious, stated on direct examination, "[t]he possibility of loss of life would be very remote." On cross-examination, he acknowledged that he observed no life-threatening conditions involving D.U. No one testified the subsequent facial bruises to the child were life-threatening. At base, the trial court's decision to terminate parental rights arose from its stated conviction at the close of testimony that it discounted the parent's testimony explaining the injuries and was convinced the child's injuries were not accidental but the results of intentional abuse. A return of custody to a parent or parents that the court is convinced purposely injured a child is clearly against their best interest.

In juvenile matters, the concern to which all others must yield is the best interests of the child. *Baker v. Arkansas Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). With the exception of a few weeks, D.U.'s entire life has been spent apart from her natural parents. She has now had little or no meaningful contact with them in the last two years. She has been out of their custody for almost three-and-one-half years. At this point, she no doubt, does not even know them as her parents. The need for stability and permanence weigh in favor of affirmance. Yet, I am troubled by the untenable position our law places the ADHS. The agency in this case, and no doubt others, simultaneously pursued reunification with the natural parents and termination of parental rights. The rights of parents to raise their natural children, though subordinate to the children's welfare, remain precious and demand undistracted attention by a service provider that is not likely to become at cross-purposes with itself.