2010 Ark. App. 680

Steven PORTER, Appellant

v.

ARKANSAS DEP'T OF HUMAN
SERVICES and Minor
Child, Appellees.

No. CA 10–595.

Court of Appeals of Arkansas.

Oct. 6, 2010.

Leah Beth Lanford, Little Rock, for appellant.

Keith L. Chrestman, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellee.

WAYMOND M. BROWN, Judge.

On March 12, 2010, the Pulaski County Circuit Court entered an order terminating Elizabeth Dumas's [1] and Steven Porter's parental rights to their child R.P., born May 2, 2008. Porter appeals the order arguing that there is insufficient evidence to support the trial court's decision. We affirm.

The Arkansas Department of Human Services (DHS) took R.P. into emergency custody on June 21, 2008, after being notified that Dumas had been arrested for second-degree battery. According to DHS's affidavit, Dumas was seen abusing the infant on June 19, 2008, while in the emergency room at Arkansas Children's Hospital. The trial court granted DHS emergency custody of R.P. on June 24, 2008.

In an order filed July 15, 2008, the court found that there was probable cause that the conditions that had caused removal remained, and continued R.P.'s custody with DHS. The order also required Dumas and Porter to submit to psychological evaluations and random drug and alcohol screens. Porter was granted supervised visitation, and a DNA test was ordered to establish paternity.

On August 20, 2008, the court found that R.P. was dependent-neglected. According to the order, Porter was to attend outpatient drug treatment. The case was reviewed on December 2, 2008. In the review order filed December 29, 2008, the court found that the case was moving toward an appropriate plan. As a result, the goal of the case remained reunification.

At a permanency-planning hearing on May 5, 2009, the court found that the parents were not making significant measurable progress and changed the goal to termination of parental rights. In the order filed May 26, 2009, the court stated in pertinent part:

The court was hoping that the father would have a steadying influence on the mother who has lacked insight and emotional maturity. However the parents have separated at times and have just most recently reunited this past week. The mother relied to her detriment on the father's practice of providing her transportation which resulted in the mother's missing some appointments. . . . The putative father's psychological evaluation diagnoses Mr. Porter with a personality disorder and recites that the parents are unstable as a couple. Mr. Porter is not engaged in counseling.

The order also stated that Porter was to follow the recommendations of the psychological evaluation, which were to participate in family or marital counseling with Dumas, attend parenting counseling and classes, and to continue to work and maintain a stable housing environment. Porter was ordered to give DHS a copy of the DNA paternity test that he testified he had taken.

DHS filed a petition for termination on July 16, 2009. In the petition, DHS alleged that R.P. had been adjudicated dependent-neglected and had continued out of his parents' custody for a year, and that despite meaningful efforts by DHS to rehabilitate the parents and correct the conditions that caused removal, those conditions had not been remedied.

At the permanency-planning hearing held on August 18, 2009, the court accept-

1. Although Elizabeth Dumas's rights were ter-    minated, she is not the subject of this appeal.

ed Dumas's and Porter's motion to not go forward with termination. According to the order filed on September 15, 2009, the court found that the parents were making progress in complying with its order. Additionally, all the parties agreed that DHS did not have to file another termination petition for the next hearing, which would be the termination hearing.[2]

The termination hearing took place on January 26, 2010. Lasonya Morehead, the DHS worker, testified that she recommended termination because the child had been out of the home for a long period of time and because Dumas had disclosed that there was domestic violence in the relationship. Morehead acknowledged that she was late sending a referral for Porter to start individual counseling, but he was getting family counseling through Ms. Lee Ann Welsh. According to Morehead, it was in R.P.'s best interest to have his parents' rights terminated.

On cross-examination by the attorney ad litem, Morehead stated that R.P. was not a special-needs child and did not have any delays. She said that he had been in foster care "since shortly after birth." Morehead was shown Dr. Deyoub's psychological report on the parents and agreed that they both suffered from personality disorders.

On cross-examination by Porter's attorney, Morehead again stated that the referral for Porter's individual counseling was "real late." She said that Porter had stable employment and consistent visitation throughout the case.

Lee Ann Welsh testified that she had provided family therapy for Dumas and Porter. She stated that during a session in September, it was disclosed that Porter had thrown Kool–Aid on Dumas. According to Welsh, Porter did not take any responsibility for the incident. Welsh also said that there was verbal abuse going on in the home. Welsh testified that she informed Porter on September 21, 2009, that Mr. H. Lynn Hemphill would be providing him with therapy because Porter did not seem to be responding well to her. Welsh stated that Dumas called her on October 23, 2009, and told her that Porter had hit her in the mouth and kicked her in the back and ankle. Welsh said that she told Dumas to leave.[3] Welsh testified that when she saw Dumas four days later, Dumas had a bruise on her face and she was limping. Porter came for a session in November to discuss his and Dumas's relationship issues. According to Welsh, Porter took no responsibility, but instead placed all of the blame on Dumas. Welsh also stated that Porter cursed at her and left the room. Welsh told the court that Porter said, "F* *k it, and I don't care. You can have my f* *king kid," before leaving the room. Welsh stated that she had concerns about the care of R.P. if Dumas and Porter were to get back together. Welsh said that even when the two are separated, "they always seem to find their way back to each other." Welsh testified that Dumas and Porter said they have not been together since December.

On cross-examination by the attorney ad litem, Welsh stated that both Dumas and Porter were diagnosed with personality disorders, and that there is not any medication that can fix a personality disorder. According to Welsh, there is "no quick fix to someone who suffers from a personality

---

2. The hearing was scheduled to take place on November 17, 2009, but DHS requested a continuance. The court granted the continuance, and an order was entered on December 17, 2009.

3. Dumas moved out that day.

disorder." Welsh testified that the turmoil between Dumas and Porter as well as the domestic abuse is indicative of people who suffer from personality disorders.

On cross-examination by Porter's attorney, Welsh stated that Porter was not the sole aggressor in the relationship. According to Welsh, Porter would have to complete anger management and domestic violence treatment, and take responsibility for his role in the conflicts with Dumas before he would be ready to have custody of R.P. She acknowledged that she had not been working with Porter since he began seeing Hemphill, and that it would be hard for her to say whether or not he was presently in a position to take custody of R.P. Welsh testified that she had met Porter's other children, two of which he was raising, and that they were "very pleasant and very appropriate." However, she stressed concern with R.P. being in Porter's custody because of the verbal abuse. According to Welsh, verbal abuse had taken place in front of Porter's other two sons.

Wendy Childs, an adoption specialist, testified that R.P. was adoptable. She also stated that she ran a data-matching list and came up with thirty-four possible families.

Porter testified that he is aware of his anger problems. He stated that he tries to deal with his anger by walking away every time a fight "congregates." Porter said that he was committed to his therapy with Hemphill. He testified that he believed he was in a position to take R.P. home with him that day. According to Porter, he had an appropriate home with two other sons there. Porter said that he did not consider himself to be a violent person but that it depended on who he was with. Porter stated that he took responsibility for some of the volatility in his relationship with Dumas. He testified that most of the testimony about him abusing Dumas was not true, and that he tried to walk away most of the time. Porter admitted that he poured Kool–Aid on Dumas during an argument, but he insisted that he was sorry. Porter testified that one of the reasons he and Dumas kept rekindling their relationship was because they were told by Charlotte Washington, of DHS, that they had to remain together in order to get R.P. back. Porter said that June 2009 was the first time there was domestic violence in his and Dumas's relationship. Porter denied telling Welsh that they could have his child, and told the court that he wished to maintain his parental rights.[4]

On cross-examination by the attorney ad litem, Porter admitted he has anger issues; however, he maintained that he did not start any of the problems he had with Dumas. Porter acknowledged that what he was currently dealing with in trying to gain custody of his son "is enough to make [him] go angry." Porter testified that he and Dumas had split up and gotten back together twice. Porter stated that this was all Dumas's fault.

On cross-examination by Dumas's attorney, Porter denied hitting Dumas in the face. According to Porter, Dumas kneed herself. Porter also said that he did not kick Dumas *hard* in the staffing when he told her she was not worth kicking, but that "now [she] can tell somebody [he] kicked [her]."

On re-cross by DHS, Porter stated that he was arrested in 1999 for battery against Mary Turner, the mother of his other two

---

4. He told the court if he could not maintain his rights, he wanted Dumas to be able to maintain hers.

sons. He denied ever battering his daughter's mother.

At the conclusion of the hearing, the court stated that it was very concerned about other aspects of Porter's personality and his behavior. It also said that it was not impressed with Porter's abusive conduct. The court made a verbal ruling:

> In order to prove its case for termination of parental rights, the agency has a burden of proof by clear and convincing evidence. In the petition, the agency seeks to terminate the parental rights of Elizabeth Dumas and Steven Porter with respect to their child, R.P., whose date of birth is May 2 of '08. In order to prove its—the grounds upon which the agency argues termination is that the child has been outside of the home in excess of one year and that, despite a meaningful effort by the agency to remediate the conditions, the parents have failed to remediate the conditions. At least that's the allegation. As a factual matter, the Court does find that the child has been out of the home seventeen months, so the child has been out of the home in excess of one year. The remaining issue is whether or not the parents have remedied the situation that caused removal or whether or not there have been some other subsequent issues that prevent return of the child to the custody of either parent.
>
> Let me state that both parents still have credibility—I'd say major credibility issues with this Court, which is certainly one of the Court's considerations.... The case was adjudicated on August 5 of '08. I guess, before I lose this point, this child has been in foster care all but two months of its life at this point. That's something that the Court has to weigh because, to the extent that people are asking for additional time, that's an important factor for the Court to weigh because the law says that I have to look at permanency from a child's point of view. The question is, how fair is it to keep the child in the limbo land of foster care when we believe children need to be in forever, permanent homes, preferably with the parents if they can be fit and appropriate persons? If not, we need to find somebody else. In any event, I just wanted to make that observation while it was on the top of my head.
>
> . . . .
>
> The Court would note with interest the testimony of Ms. Welsh today because that essentially chronicled ongoing domestic abuse between the mother and the father. I do not believe and I find that engaging in domestic abuse does not make a healthy, appropriate environment for children to live in. There may have been times they both might have been instigators of domestic abuse, but that's not an acceptable environment in which to raise the kids.
>
> Now, if I had looked at this case as of the original August date, this had a terrible history at that time.... Had we gone forward, there is no doubt in my mind that I would have terminated as of the August date. Fast-forward to the next scheduled date, which was November. At that point, I would have terminated at that time because, even though they were involved in therapy, that's kind-of the time frame of Ms. Welsh's testimony, which I thought was pretty important. They were having domestic-violence episodes in September. There was the [K]ool–Aid incident. There was the incident where Mr. Porter struck and kicked Ms. Dumas, all happening in the fall. I'm looking at this case in November, and it's not a good situation for reunification.

The question really for me to resolve today is, now that they got this extra time when we did not go forward on the November 17 date and we're here really about a couple of months later, has that made a material difference in the prospects for reunification? The short answer to that is no. I am still wholly unimpressed with Mr. Porter. He's an abusive individual. I think he's going through the motions, through what he thinks he needs to do; but then, when you curse at the therapist and say "f* *k this and that," to me, that's a sign you're not taking this seriously, and that was a bad omen for the outcome of this case.

. . . .

The bottom line is this: I could not in good conscience return this child to either of these parents today. They would need several months of an unblemished record of stability, no domestic violence, and doing the things that they needed to do. I'd have to see them do that for several months to make sure that they were on the right track.

The question is, when the child has already been outside of the home for a year and seven months and all but two months of its life, should I keep this child in limbo another several months to see if the parents can get their act together? ... The statute says, unless there are compelling reasons to give the parents more time—and that's after a year. Now we're at a year-and-a-half. In the absence of compelling reasons, I really must terminate and seek other permanent options for the child....

There are no compelling reasons on this record for me to give the parents more time. I think they have been given more than adequate time. They have failed to get their acts together and to make themselves fit and appropriate persons. Moreover, I think it's harmful to the child just to keep him in the limbo land of foster care. This is an adoptable child. He needs permanency as quickly as it can be obtained, so I do find that he's an adoptable child. I do find that it's in the child's best interests to terminate parental rights. Based on the totality of the evidence, I do find that the agency has proven its case for termination of parental rights by clear and convincing evidence.

The written order filed March 12, 2010, mirrored the oral ruling. This appeal followed.

When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship.[5] Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents.[6] Parental rights, however, will not be enforced to the detriment or destruction of the health and well-being of the child.[7] We review the termination of parental rights de novo.[8] The facts warranting termination of parental rights must be proven by clear and convincing evidence, and in reviewing the trial court's evaluation of the evidence, we will not reverse unless the court's finding of clear and convincing evidence is clearly erroneous.[9] Clear and convincing evidence is that degree of proof which will produce

**5.** *J.T. v. Ark. Dep't of Human Servs.,* 329 Ark. 243, 947 S.W.2d 761 (1997).

**6.** *Wade v. Ark. Dep't of Human Servs.,* 337 Ark. 353, 990 S.W.2d 509 (1999).

**7.** *Id.*

**8.** Ark.Code Ann. § 9–27–341(b)(3) (Repl. 2009).

**9.** *Baker v. Ark. Dep't of Human Servs.,* 340 Ark. 42, 8 S.W.3d 499 (2000).

in the fact finder a firm conviction regarding the allegation sought to be established.[10] In resolving the clearly erroneous question, we must give due regard to the opportunity of the trial court to judge the credibility of witnesses.[11] Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations.[12]

An order forever terminating parental rights must be based upon clear and convincing evidence that the termination is in the best interests of the child, taking into consideration the likelihood that the child will be adopted and the potential harm caused by continuing contact |₁₁with the parent.[13] In addition to determining the best interests of the child, the court must find clear and convincing evidence that circumstances exist that, according to the statute, justify terminating parental rights.[14] One such set of circumstances that may support the termination of parental rights is that the child "has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent."[15] Another set of circumstances is that other factors arose subsequent to the filing of the original petition for dependency-neglect that "demonstrate that return

of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent."[16]

██ Porter argues that the evidence was insufficient to support the trial court's termination of his parental rights. He concedes that R.P. is adoptable and could achieve permanency through adoption. However, he argues that the evidence did not support the finding that termination was in R.P.'s best interest because DHS failed to show that R.P. would be in any |₁₂danger of harm if placed in his custody. This argument is without merit. The harm referred to in the termination statute is "potential" harm; the circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm.[17] Moreover, the trial court touched on the potential harm R.P. would face if kept in the "limbo land of foster care" since he needed permanency as quickly as it could be obtained. Thus, there was sufficient evidence to support the trial court's finding that termination of Porter's parental rights was in R.P.'s best interest.

Porter also argues that there was insufficient evidence to support the ground that Porter was unable to correct the conditions

10. *Id.*

11. *Id.*

12. *Ullom v. Ark. Dep't of Human Servs.,* 340 Ark. 615, 12 S.W.3d 204 (2000).

13. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl. 2009).

14. Ark.Code Ann. § 9–27–341(b)(3)(B) (Repl. 2009).

15. Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a) (Repl.2009).

16. Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(a) (Repl.2009).

17. *Lee v. Arkansas Dep't of Human Servs.,* 102 Ark. App. 337, 285 S.W.3d 277 (2008).

that caused R.P.'s removal. Porter contends that he did not cause the child's removal, therefore, his parental rights should not have been terminated. Porter insists that his parental rights were erroneously terminated on this *sole* ground. Despite Porter's contentions, it is clear that the trial court relied on the subsequent-issues ground to terminate his parental rights. It is apparent from the trial court's oral remarks and the written order that this ground was a basis for the court's decision. Although the trial court did not quote the statutory language in its exact form, the court's meaning could not be more clear.[18]

Sufficient evidence supports the court's termination of Porter's parental rights to R.P. based on the subsequent-issues ground. Evidence revealed that after R.P. was adjudicated dependent-neglected, Porter abused Dumas on at least two occasions. Porter was also diagnosed with a personality disorder, which testimony revealed could not be quickly fixed. Additionally, testimony showed that Porter cursed the family therapist and stated that they could have his child. At the hearing, Porter admitted to having anger issues and agreed that he needed more therapy. Based on a de novo review, we cannot say that the trial court erred in terminating Porter's parental rights. Accordingly, we affirm.

Affirmed.

ROBBINS and KINARD, JJ., agree.

18. *See Fields v. Ark. Dep't of Human Servs.,* 104 Ark. App. 37, 289 S.W.3d 134 (2008).