2010 Ark. App. 747

**Khadya SMITH, Appellant**

v.

**ARKANSAS DEP'T OF HUMAN SERVS. and Minor Children, Appellees.**

**No. CA 10–520.**

Court of Appeals of Arkansas.

Nov. 3, 2010.

Leah Beth Lanford, Little Rock, for appellant.

Keith L. Chrestman, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellee.

WAYMOND M. BROWN, Judge.

Appellant Khadya Smith appeals from the orders terminating her parental rights to her children, J.W., born April 2, 1998, and K.D., born January 5, 2004.[1] She challenges the trial court's "best-interest" finding as to the children's adoptability. We affirm.

Arkansas Department of Human Services (DHS) filed a petition for dependency-neglect on August 13, 2007. In the petition, DHS alleged that the children were in serious harm as the result of neglect, and sought court ordered protective services (PS) to ensure the health and safety needs of the children.[2] DHS filed an amended petition for emergency custody and dependency-neglect on November 1, 2007. In the petition, DHS alleged that removal of the children from parental or custodial care was necessary to protect the children from immediate danger. According to the supporting affidavit, Smith had tested positive for cocaine on October 31, 2007. As a result, DHS took emergency custody of J.W. and K.D. on November 2, 2007. An order for emergency custody was filed on November 7, 2007. In that order, the court found that DHS had been involved with the family since 2004 and had provided the family with cash assistance, transportation, referrals for housing, drug testing, referral for drug treatment, and offered parenting classes. According to the order, the services provided to Smith did not prevent removal of her children because she left inpatient drug treatment and continued to use cocaine.

A probable cause order was entered on November 15, 2007, stating that all parties stipulated that probable cause existed to

---

1. Mark Davis, the father of K.D., also had his parental rights terminated; however, he is not the subject of this appeal.

2. At this time, the children were to remain in the home with Smith.

continue the children in DHS's custody. The children were adjudicated dependent-neglected in an order filed on January 25, 2008. The primary goal of the case was reunification, and Smith was ordered to attend and complete inpatient drug treatment. By the time of the March 26, 2008 review hearing, Smith had failed to complete inpatient drug treatment as ordered. Following this hearing, reunification and relative placement were concurrent goals. Smith was not present at the August 8, 2008 review/permanency planning hearing because she was recovering from an operation. She was granted additional time to complete inpatient drug treatment. The goals remained reunification and relative placement.

At the November 5, 2008 review hearing, the court made a finding that Smith had refused to comply with the case plan and the court orders.[3] DHS filed a petition for termination on December 3, 2008. It filed an amended petition for termination on March 10, 2009. The court set a termination hearing for April 15, 2009; however, it was continued to May 20, 2009, due to Smith's absence.

At the May 20, 2009 termination hearing, Marcie Bragg, a Phillips County DHS Family Service Worker, testified that the children were currently in therapeutic foster placement. J.W. needed to be closely monitored and K.D. was placed with him so that they could remain together. Bragg stated that there were prospective adoptive parents for the children if parental rights were terminated. She said that DHS had not done any adoption searches because parental rights had not been terminated. According to Bragg, someone had made inquiries about K.D. Bragg stated that Smith had entered three drug treatment centers, and had failed to suc-

cessfully complete any of them. Bragg testified that Smith did not comply with any of the requirements of the case plan: submitting herself to drug screens, attending anger management, obtaining stable housing and employment, and successfully completing inpatient drug treatment. Bragg stated that DHS recommended termination of parental rights.

On cross-examination, Bragg stated that she had not performed an adoption search for the children, but that she generally did not run such a search until after parental rights are terminated. She also said that no one had requested DHS to run an adoption search on the children.

On redirect, Bragg stated, "people have requested information on [the] children but I informed them that I could not talk about it." However, Bragg confirmed that she did receive an inquiry about the adoptability of one of the children.

Smith testified that she has four children, and that there came a time when all of them were ordered into foster care. She stated that J.W. and K.D. were ordered into care due to her failed drug test. According to Smith, she was smoking cocaine at the time of the drug test. Smith acknowledged that she did not complete the first two drug treatment centers she entered; however, she stated that she believed that she had completed Hoover Drug Treatment Center. Smith testified that she spent twenty-nine days at Hoover and that the reason she did not stay the last day was because someone told her that she could leave a day early. Smith said that she had not smoked cocaine for eight months, and that no one from DHS had tested her since October 31, 2007. Smith stated that she did not recall being court ordered to take a drug test on No-

---

**3.** Smith had entered a drug rehabilitation center but was discharged for failure to follow rules.

vember 12, 2008, because she would have taken it.

On cross-examination, Smith testified that she did not complete parenting classes because she did not have any transportation to the classes. She also stated that she did not follow up with the psychologist who performed her psychological evaluation. During the hearing, Smith was adamant that she had changed.

Smith was asked to submit to a drug test by the attorney ad litem. The court stated that it would allow the test as long as someone could do it. However, before Smith could be tested, she told the court that she would consent to the termination. DHS objected to Smith's consent. The court overruled the objection. It asked DHS and Smith's attorney to brief the issue of whether or not DHS or the court could refuse to accept a voluntary termination. The hearing was rescheduled for June 3, 2009.[4]

The termination hearing was set for September 2, 2009; however, it was continued until November 18, 2009, and again until December 9, 2009. Before the proceedings began, the court ordered Smith to take a drug test. The court took a break to allow Smith to be transported for testing. Charlotte Milligan, the DHS worker who attempted to administer the drug test to Smith, testified that Smith did produce a urine sample, but not in the sample cup. She stated that Smith told her that she accidently missed the cup. Milligan attempted two more time to obtain samples from Smith; however, Smith told her that she could not urinate. On cross-examination, Milligan stated that she had a testing kit with her and that she was prepared to take a sample from Smith. Milligan returned and informed the court that Smith could not produce a sample.

The court stated that it viewed Smith's inability to produce a sample as a failed drug test.

Smith testified that she did not complete parenting classes as ordered due to her lack of transportation. She also stated that she did not ask DHS for transportation. She said that when she left Hoover, she was under the impression that she had successfully completed the drug-treatment program. Smith stated that she stopped going to counseling because they stopped sending her letters. She also said that she believed that she had done everything that she was supposed to as far as anger management was concerned. Smith told the court that she did not want her parental rights to be terminated and that she was ready to care for her children.

On cross-examination, Smith said that she completed Hoover. According to Smith, the people at Hoover told her she could leave, but sent her a letter to the contrary. She also stated that she had not used drugs since November 2008. However, she said that she did have pain killers in her system.

Bragg testified that a PS case was opened on Smith's children in 2004 because of inadequate supervision of J.W. She stated that J.W. and K.D. were removed from Smith in this case because Smith failed a drug test. On cross-examination, Bragg stated that DHS was relieved from providing Smith with services because of Smith's failure to cooperate and Smith's aggressiveness toward Bragg.[5]

At the conclusion of the hearing, the court went off the record to allow Smith another chance to submit to a drug test. Smith, again, failed to produce a sample. The court granted DHS's petition for termination:

---

4. Following the May 20, 2009 hearing, Smith refused to sign the consent.

5. Smith had threatened to harm Bragg.

Ms. Smith has been enrolled in three substance abuse programs, the longest stay, as we said, was one day short of completing the program at, I believe, Hoover and Ms. Smith failed to complete the program and left a day early. However, her testimony regarding the failure is very different from that of the report from Hoover, in that they say that she was not successful with that program and was told that she might try else where because she was not successful there.

Ms. Smith states that they told her she was through and that she could leave and they were going to discharge her a day early. The fact is that she's had three substance abuse programs and has not completed any of them successfully according to the reports from the substance abuse program people.

And apparently that is the case because she has had negative [sic] drug screens or refused to give a drug sample or failed to give a drug sample ever since. The Court finds that when someone fails to produce a sample, that it is the same as if they expect their sample to be positive and that is why they don't produce one.

In this particular case, it is significant to the Court that Ms. Smith was ordered to produce a sample the last time we were here and that was when she decided that she would throw in the towel and give up her parental rights.

She, apparently, thought that that drug screen was going to be positive. Today, again, she was asked for a sample and first, she gave a sample and used the excuse that she missed the cup and then that she could not give one again.

The Court just finds that her credibility is at issue here, you know, if you are on the line and you're about to loose [sic] your children, and you are given a chance to give a sample and you know its going to be positive, number one, you're not going to miss the cup, and number two, you are going to produce another sample if you are about to loose [sic] your children and you know that something this serious is on the line.

If you know that you are going to be negative, then you would have produced a sample and that's just the opinion of the Court. I find her credibility at issue there. Further, her testimony today has been that she didn't complete anger management because she thought she was finished and she thought she didn't have to. She didn't go to counseling anymore because they didn't send her any more letters and she thought she was through with that. She thought she was discharged from rehab and that's why she left there. She thinks that, according to her testimony, that she did everything but she knows that she didn't complete parenting or drug testing.

The fact is that she hasn't completed anything. She hasn't completed counseling, she hasn't completed anger management, she hasn't completed parenting and she hasn't completed her drug testing and drug screening. And she hasn't completed rehab and she doesn't have a job, and she doesn't have transportation and in effect, she has not done anything for these children except, according to her testimony, she's bought them some Christmas presents.

I am not at all convinced that there is really anything that she has done in making any kind of significant effort to get these children back. And while I can see from her actions and her statements today, that she doesn't want to loose [sic] her children and she wants to get them back and, you know, any mother, you would think, would, and I understand that.

But, we are down to the place in this case where we've got to do what's in the best interest of these children. These children have been without any stability in their life now for a long time. If there were some little snippet of evidence that something was going to change here or that she was trying desperately to turn this around, then we would have more to think about. But, there's just no evidence of that here. I am not going to keep these children in this situation and I'm not going to continue to cause the Department to keep having to deal with this[.] ... I am going to grant the Petition for Termination of Parental Rights and Ms. Smith, I am really sorry.

The court filed two orders on February 17, 2010, terminating Smith's parental rights to her children.[6] Smith filed a timely notice of appeal on March 9, 2010. The court filed two amended orders of termination on April 7, 2010.[7] Smith's attorney failed to file a timely appeal to the amended orders; however, our supreme court granted the attorney's motion to file a belated appeal. This appeal followed.

 |₉When the issue is one involving the termination of parental rights, there is a heavy burden placed upon the party seeking to terminate the relationship.[8] Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents.[9] Parental rights, however, will not be enforced to the detriment or destruction of the health and wellbeing of the child.[10] We review the termination of parental rights de novo.[11] The facts warranting termination of parental rights must be proven by clear and convincing evidence, and in reviewing the trial court's evaluation of the evidence, we will not reverse unless the court's finding of clear and convincing evidence is clearly erroneous.[12] Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction regarding the allegation sought to be established.[13] In resolving the clearly erroneous question, we must give due regard to the opportunity of the trial court to judge the credibility of witnesses.[14] Additionally, we have noted that in matters involving the welfare of young children, we will give great weight to the trial judge's personal observations.[15]

 |₁₀An order forever terminating parental rights must be based upon clear and convincing evidence that the termination is in the best interests of the child, taking into consideration the likelihood that the child will be adopted and the potential harm caused by continuing contact with the parent.[16] In addition to determining the best interests of the child, the court must find clear and convincing evidence that circumstances exist that, according to

---

6. One order per child.

7. The court had to correct dates within the original orders.

8. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997).

9. *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999).

10. *Id.*

11. Ark.Code Ann. § 9–27–341(b)(3) (Repl. 2009).

12. *Baker v. Ark. Dep't of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000).

13. *Id.*

14. *Id.*

15. *Ullom v. Ark. Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000).

16. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl. 2009).

the statute, justify terminating parental rights.[17] One such set of circumstances that may support the termination of parental rights is that the child "has been adjudicated by the court to be dependent-neglected and has continued out of the home for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the home and correct the conditions which caused removal, those conditions have not been remedied by the parent."[18] Another set of circumstances is that other factors arose subsequent to the filing of the original petition for dependency-neglect that "demonstrate that return of the juvenile to the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent return of the juvenile to the custody of the parent."[19]

Smith argues that the evidence that termination was in J.W.'s and K.D's best interests was insufficient. She specifically argues that the "complete lack of evidence supporting the likelihood of [the children's] adoptability renders the trial court's ruling clearly erroneous in that it undermines the court's 'best interest' analysis." Smith cites *Haynes v. Ark. Dep't of Human Servs.*,[20] in support of her position that this case must be reversed. However, this case is distinguishable. In *Haynes*, there was no evidence concerning adoptability presented at the termination hearing. Here, Bragg testified that there were prospective adoptive parents for the children if parental rights were terminated. She said that someone had already inquired about K.D. She also stated that it was her practice to wait until after termination before running an adoption search. Additionally, the evidence of potential harm was overwhelming in that Smith had not completed anything required of her by the court or her case plan throughout this case. Therefore, we affirm.[21]

Affirmed.

ABRAMSON and HENRY, JJ., agree.

---

17. Ark.Code Ann. § 9–27–341(b)(3)(B) (Repl. 2009).

18. Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a) (Repl.2009).

19. Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(a) (Repl.2009).

20. 2010 Ark. App. 28, 2010 WL 135194.

21. *See Reed v. Ark. Dep't of Human Servs.,* 2010 Ark. App. 416, 375 S.W.3d 709.